# In the United States Court of Federal Claims

No. 06-633

(Filed: March 31, 2011)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | |
|---|---|
| JUDITH LOUISE CRONIN, | |
| *Plaintiff*, | Military pay; statute of limitations; Temporary Disability Retirement List; Servicemembers' Civil Relief Act; tolling; 50 U.S.C. app. § 526; period of military service |
| v. | |
| THE UNITED STATES, | |
| *Defendant*. | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

*Jeffery M. Chiow,* Washington, D.C., for plaintiff.

*Armando A. Rodriguez-Feo*, United States Department of Justice, Civil Division, Washington, D.C., with whom were *Donald E. Kinner*, Assistant director, *Jeanne E. Davidson*, Director, and *Tony West*, Assistant Attorney General, for defendant.

_____

OPINION

_____

BRUGGINK, *Judge*.

Pending is plaintiff's motion for partial judgment on the administrative record pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC"). Plaintiff's motion is limited to the issue of whether the tolling provision of the Servicemembers' Civil Relief Act ("SCRA") brings plaintiff's claims within this court's six-year statute of limitations. Also pending is defendant's motion to dismiss pursuant to RCFC 12(b)(1) based on the alleged untimeliness of plaintiff's suit. The motions are fully briefed and we heard oral argument on February 28, 2011. For the reasons explained

below, we grant plaintiff's motion and hold that the SCRA's tolling provision applies to Ms. Cronin's claims.

BACKGROUND[1]

Judith L. Cronin ("Ms. Cronin") entered active duty in the United States Navy in 1977. She was scheduled to be promoted to the rank of Commander on October 1, 1994. Her promotion was delayed, however, due to a physician's report stating she was not fit for duty. Shortly thereafter, a medical board recommended she be placed on limited duty. Her case was referred to a Physical Evaluation Board ("PEB"), which, in late 1995, found her to be 60 percent disabled due to heel injuries and bipolar disorder.

Ms. Cronin continued work on active duty, though in a limited status, until May 31, 1996, when she was promoted to Commander and simultaneously placed on the Temporary Disability Retirement List ("TDRL"). On the same date, she was issued DD Form 214, "Certificate of Release or Discharge from Active Service." On October 1, 2000, Ms. Cronin was removed from the TDRL and permanently retired at a 30 percent disability rating. In 2003, she petitioned the Board of Corrections of Naval Records ("BCNR") for a review of her disability rating. The BCNR denied her petition on August 13, 2004.

On September 7, 2006—more than a decade after being placed on the TDRL but not quite six years after being permanently retired—Ms. Cronin filed suit here *pro se*, alleging that the delay in her promotion to Commander was improper and that she was therefore entitled to back pay during that period. She also alleged that the Navy improperly calculated her disability rating and that, when she was placed on the TDRL, she should have received a rating of 100 percent based on ten conditions or injuries.

In an unpublished order dated May 16, 2008, we granted the government's motion to dismiss her case as untimely, granted partial judgment on the administrative record, and remanded a single issue to the BCNR. Specifically, we held that Ms. Cronin's first claim, the delay in promotion, had accrued on October 1, 1994, the date she claims her promotion should have occurred. Because her suit was not filed within six years of that date, we

---

[1] The facts are taken from the administrative record. We present here only those facts relevant to the issue of the statute of limitations.

dismissed that claim as barred by our statute of limitations. As to her second claim, we held that, because nine of the ten alleged disabilities were the subject of the 1995 PEB, those claims were also time barred. Although the tenth alleged disability, post traumatic stress disorder ("PTSD"), was not considered by that PEB and thus was not time barred, we held that the BCNR did not err when it found there was no evidence of PTSD at the time Ms. Cronin was placed on the TDRL. We thus granted judgment on the administrative record in favor of the government on this aspect of her claim.

We did, however, remand to the BCNR for the limited purpose of recalculating Ms. Cronin's annuity. The BCNR credited her with additional time served and accordingly increased her monthly retirement pay and issued her a cash credit for the amount wrongly withheld during the six-year period prior to her suit. When informed of this corrective action, we issued an order to show cause why the case should not be dismissed. Ms. Cronin did not respond to the order, and we dismissed the case with prejudice.

Ms. Cronin appealed to the Court of Appeals for the Federal Circuit. That court *sua sponte* raised the question of whether the tolling provision of the SCRA, 50 U.S.C. app. § 526(a) (2006), applied. The Federal Circuit subsequently remanded the case to this court with instructions to determine if the tolling provision applied to the time Ms. Cronin spent on the TDRL. That court also noted evidence in the record, apparently overlooked by the BCNR, of PTSD and its potential exacerbation by other conditions. Accordingly, it instructed that, if on remand we find the other alleged disabilities are not time barred, we should consider their possible effect on the PTSD.

DISCUSSION

We have jurisdiction under the Tucker Act, which grants jurisdiction over certain claims seeking money damages from the United States. 28 U.S.C. § 1491(a)(1) (2006). We may also order the correction of military records "as an incident of and collateral to" an award of monetary damages. *Id.* § 1491(a)(2); *see Voge v. United States*, 844 F.2d 776, 781 (Fed. Cir. 1988).

All claims brought under the Tucker Act are subject to a six-year statute of limitations. 28 U.S.C. § 2501 (2006). Accordingly, for this court to entertain Ms. Cronin's claim, her suit must have been filed within six years after the accrual of the causes of action. As a general matter, a claim accrues "when all the events have occurred that fix the alleged liability of the Government and entitle the claimant to institute an action." *Ingrum v. United*

*States*, 560 F.3d 1311, 1314 (Fed. Cir. 2009) (citing *Alliance of Descendants of Tex. Land Grants v. United States*, 37 F.3d 1478, 1481 (Fed. Cir. 1994)).

We previously held, and the parties do not dispute, that Ms. Cronin's two causes of action accrued in 1994 and 1995, respectively. *See Martinez v. United States*, 333 F.3d 1295, 1314 (Fed. Cir. 2003) (holding that cause of action accrues on "the date on which the service member was denied the pay to which he claims entitlement"); *Chisholm v. United States*, 82 Fed. Cl. 185, 198 (2008) (holding that claim for back pay due to failure to promote accrued at the time the promotion was prevented); *Sanders v. United States*, 32 Fed. Cl. 573, 575 (1995) (citations omitted) ("Claims alleging an unlawful failure to promote accrue on the date the application for promotion is denied."). Because she did not file suit here until 2006, Ms. Cronin's claims would thus be untimely but for the operation of some mechanism to toll the statute of limitations. Ms. Cronin argues that the tolling provision of the SCRA applies to the time she spent on the TDRL and her claims therefore did not accrue until her permanent retirement in 2000 and were thus timely filed in 2006.

I.  Statutory Background

   *A. The SCRA's Tolling Provision*

The SCRA is the present incarnation of the Soldiers' and Sailors' Civil Relief Act of 1940 ("SSCRA")[2] and is designed to strengthen national security by allowing servicemembers "to devote their entire energy to the defense needs of the Nation [and] to provide for the temporary suspension of judicial and administrative proceedings and transactions that may adversely affect the civil rights of servicemembers during their military service."[3] 50 U.S.C. app. § 502.

---

[2] The SSCRA was amended and renamed in 2003. The effect of its provisions remained the same, although some definitions were reorganized. *See* note 11 and accompanying text. In this opinion, consistent with the Federal Circuit's mandate on remand, we cite and analyze the SCRA—the version in effect at the time Ms. Cronin brought suit. Under either version, the outcome is the same.

[3] The Act also serves the inverse purpose of protecting the rights of persons with a claim *against* a servicemember. *See Ricard v. Birch*, 529 F.2d 214, 216-17 (4th Cir. 1975) (citing *Ray v. Porter*, 464 F.2d 452, 455 (6th Cir. 1972)).

4

The SCRA's historical antecedents can be seen in state laws during the War of 1812 and in the federal laws promulgated during the Civil War and World Wars I and II. *See* H.R. Rep. 108-81 at *38-39. One of the SCRA's most significant sections is its tolling provision, which states, in pertinent part:

> The period of a servicemember's military service may not be included in computing any period limited by law, regulation, or order for the bringing of any action or proceeding in a court . . . or other agency of a State (or political subdivision of a State) or the United States by or against the servicemember or the servicemember's heirs, executors, administrators, or assigns.

50 U.S.C. app. § 526. In essence, the Act bars any time spent in military service from being included when calculating a statute of limitation for or against that servicemember. When this provision applies, it is unconditional, *i.e.* there is no requirement that the military service actually prevented or handicapped the servicemember's ability to bring suit. *Bickford v. United States*, 656 F.2d 636, 639 (Ct. Cl. 1981); *see also Mason v. Texaco, Inc.,* 862 F.2d 242, 245 (10th Cir. 1988) (stating there is no condition precedent that military service handicapped bringing of claim).

By its terms, the Act applies to a servicemember's period of military service, defined as "the period beginning on the date on which a servicemember enters military service and ending on the date on which the servicemember is released from military service or dies while in military service." 50 U.S.C. app. § 511(3). Thus, the critical question in triggering the tolling provision is what constitutes military service. *Bickford*, 656 F.2d at 639 (citing *Ricard v. Burch*, 529 F.2d 214 (4th Cir. 1975)) ("[O]nce that circumstance is shown, the period of limitation is automatically tolled for the duration of service."). The Act defines military service to include both "active duty" *and* "any period during which a servicemember is absent from duty on account of sickness, wounds, leave, or other lawful cause." 50 U.S.C. app. § 511(2). The Act makes no mention of the TDRL.

### B. The TDRL

As a general matter, and subject to certain conditions, servicemembers who incur a physical disability while in uniform are entitled to a military retirement with pay. 10 U.S.C. § 1201 (2006). To be eligible for a disability retirement, however, the servicemember's condition must be of "a permanent

5

nature and stable."[4] *Id.* § 1201(b)(1). Servicemembers who would qualify for disability retirement but for the fact that their conditions have not yet stabilized may be placed on the TDRL. *Id.* § 1202. The Military Personnel Manual[5] describes the TDRL thus:

> The TDRL is in the nature of a "pending list" for all members who, through due process of medical procedures, have been found unfit to perform the duties of their office, grade, rank, or rating and who, according to accepted medical principles, may be permanently disabled. In this sense, the list provides a safeguard in the best interests of the government against permanently retiring a member who may subsequently fully recover, or nearly so, from the disability that originally caused the member to be placed on this list; and conversely, the list provides a safeguard in the best interests of the member from being permanently retired with a condition that may develop into a more serious permanent disability.

Military Personnel Manual 1850-030 (August 22, 2002) (citation omitted). A servicemember may remain on the TDRL for up to five years, at which time the disability is *per se* considered permanent and stable. 10 U.S.C. § 1210(b).

While on the TDRL, a servicemember receives retired pay. *Id.* § 1202. A servicemember on the TDRL also must undergo a physical examination at least once every 18 months to determine if there has been any change in the disability. *Id.* § 1210(a). An unexcused failure to report for such examinations may result in the termination of disability retirement pay. *Id.* When traveling to and from these checkups, the servicemember is entitled to the travel and transportation allowance authorized for active duty members of the same rank. *Id.* § 1210(g).

---

[4] Other prerequisites, not relevant here, are that the disability was not incurred during unauthorized absence or as a result of intentional misconduct or willful neglect. 10 U.S.C. § 1201(b)(2). Additionally, to merit a paid retirement, the servicemember must either have a 30 percent disability that was incurred while in active duty or wartime or, for a lesser disability ratings, have accumulated 20 years of service. *Id.* § 1201(b)(3).

[5] Available on the website of the Bureau of Naval Personnel at http://www.bupers.navy.mil/ReferenceLibrary/MILPERSMAN.

If one of these periodic checkups reveals a change in the disability, several options are available. If the disability has become permanent and stable and is at least a 30 percent disability, the servicemember is permanently retired. *Id.* § 1210(c). If the disability stabilizes at less than 30 percent, the member may be discharged.[6] If a checkup reveals that the servicemember is physically fit to perform his duties, the member may either be returned to active duty or, if requested by the member or required by law, be transferred to the reserves, discharged, or retired. *Id.* § 1210(f)(1). In the case of a member transferred, discharged, or retired, his pay is calculated as if the member had returned to active duty and then immediately retired or transferred. *Id.* § 1210(f)(2)(B).

If a servicemember is found fit and elects to return to active duty, he returns at the same rank he previously held or the next higher one. *Id.* § 1211(a)-(b). For purposes of future promotions, a member who returns to active duty may count the time spent on the TDRL as years of service. *Id.* § 1211(e). Finally, reinstatements are to be conducted "on a fair and equitable basis, with regard being given to the probable opportunities for advancement and promotion" that the servicemember would have had if not placed on the TDRL. *Id.* § 1211(f).

II. <u>Application</u>

As already discussed, the SCRA's tolling provision applies to time spent in active duty or any period of absence from active duty "on account of sickness, wounds, leave, or other lawful cause." 50 U.S.C. app. § 511(2). It seems clear that time spent on the TDRL is not active duty, and the parties have not argued otherwise.[7] Thus, the question is whether time spent on the

---

[6] Servicemembers with over 20 years of service are eligible for retirement on that basis and will be retired—not discharged—when their disability stabilizes, even if the permanent disability is less than 30 percent. *Id.* § 1210(d); *see also* note 4.

[7] The term "active duty," as used in the SCRA, is defined by 10 U.S.C. § 101(d)(1) as "full-time duty in the active military service" including "full-time training duty, annual training duty, and attendance, while in the active military service, at a school designated as a service school" but does not include full-time National Guard duty. The statutes establishing the TDRL clearly recognize that it is distinct from active duty service. *See* 10 U.S.C. §§

TDRL constitutes a period of absence "on account of sickness, wounds, leave, or other lawful cause." The alternative view, urged by the government, is that the TDRL is more akin to retirement and thus is not military service for purposes of the tolling provision. There is no controlling authority answering this precise question. We are convinced, however, for reasons discussed more fully below, that the weight of persuasive authority and the plain language of the SCRA, when viewed in light of its remedial purpose and the nature of the TDRL, support our conclusion that time spent on the TDRL falls within the SCRA's definition of military service, thus triggering the Act's tolling provision.

*A.    Plain language*

We believe that the broad language of the tolling provision and the definition of military service compel our holding here. As already noted, the tolling provision covers absences from duty as a result of sickness or wounds. Placement on the TDRL seems to be the very essence of such a health-related absence. It is premised upon a finding of "physical disability," 10 U.S.C. § 1201(a), and requires a determination based on "medical principles," *id.* at § 1202. Furthermore, the mandatory periodic medical exams recognize the medical nature of TDRL status. Thus, placement on the TDRL would appear to be an absence on account of sickness or wounds.

In addition, this interim status, in which the servicemembers' injuries are allowed to abate or worsen, strikes us as "leave, or other lawful cause" for absence from duty. A member on the TDRL is certainly absent from active duty as opposed to being permanently discharged, and the TDRL, which is established by statute, mandatory in nature,[8] and effectuated by military order, is a lawful status. The tolling provision's language has been found broad enough to encompass the time a servicemember spent on leave while earning a law degree, *Bickford*, 656 F.2d 636,[9] or in the case of one servicemember,

---

1201, 1202, 1210, and 1211.

[8] 10 U.S.C. § 1202 states that the Secretary concerned "shall" place eligible disabled members on the TDRL. *See also* 10 U.S.C. § 101(f)(1) ("'[S]hall' is used in an imperative sense.").

[9] The *Bickford* court, and all the other relevant cases prior to 2003, parsed the tolling provision of the SSCRA, the predecessor to the SCRA. The SCRA's tolling provision, however, is virtually identical to its predecessor.

8

two years as a fugitive and seven years in the brig. *Lowe v. United States*, 79 Fed. Cl. 218 (2007). Such expansive language surely encompasses a period on the TDRL recovering from or succumbing to injuries sustained in military service.

Furthermore, to the extent that the SCRA's language allows any uncertainty, we are compelled to construe the tolling provision broadly in favor of the servicemember. *LeMaistre v. Leffers*, 333 U.S. 1, 6 (1948) (citation omitted) ("[T]he Act must be read with an eye friendly to those who dropped their affairs to answer their country's call."); *Boone v. Lightner*, 319 U.S. 561, 575 (1943) ("The Soldiers' and Sailors' Civil Relief Act is always to be liberally construed to protect those who have been obliged to drop their own affairs to take up the burdens of the nation."). Faced with the unqualified language of the tolling provision and the broad definition of military service, we conclude that placement on the TDRL is an absence from duty on account of sickness, wounds, leave, or other lawful cause, and thus tolls the statute of limitations.

### B.   *The purpose and nature of the TDRL*

Our view comports with the purpose and nature of the TDRL as an interim or pending status, neither active duty nor separated from the military. The TDRL is designed as a safeguard to prevent a servicemember's premature retirement or discharge, thus protecting the interests of both the government and the member. *See* Military Personnel Manual 1850-030 (August 22, 2002). The program is built on the premise that the TDRL is a temporary status and thus, should a member recover, he may return to active duty. *See United States v. Stevenson*, 53 M.J. 257, 259 (C.A.A.F. 2000) (describing the TDRL as "a 'temporary' assignment, not a permanent separation from active duty"). In this vein, we find it telling that the SCRA defines military service to include an "absence" from duty, a term that implies a temporary period and contemplates a potential return.

Similarly, the variety of possible outcomes for a member placed on the TDRL demonstrates its unique status, distinct from both active duty and retirement. The TDRL is clearly distinct from retirement or separation, both of which are possible outcomes when a member is removed from the TDRL. *See* 10 U.S.C. § 1210(c)-(e). If placement on the TDRL were the equivalent

---

*See Lowe*, 79 Fed. Cl. at 225 n.8.

of retirement or discharge, it would be redundant to subsequently retire or discharge the member. Placement on the TDRL is in recognition of the uncertain severity and duration of a servicemember's condition. If he were to recover and return to duty, it would be anomalous to treat that period of time as the equivalent of retirement.

In addition, during a member's time on the TDRL, the connection to the military is never entirely severed. While on the TDRL, a servicemember is expected to remain in contact with and accessible to the military. Specifically, the member is required to appear for periodic medical examinations, receives a military paycheck, and is subject to military law. The medical examinations are mandatory and failure to appear may result in a loss of pay. The pay received—a combination of retired pay and active duty allowances—also demonstrates the TDRL's hybrid nature. Members on the TDRL are subject to court martial, *Stevenson*, 53 M.J. at 259, unlike discharged members, *United States v. Howard*, 20 M.J. 353, 354 (C.M.A. 1985). This "underscores the continuing military status of a member on the TDRL." *Stevenson*, 53 M.J. at 259.[10] Likewise, the Military Rules of Evidence apply to the court martial of a member on TDRL. *Stevenson*, 53 M.J. at 260 (holding thus "[i]n view of the receipt of military pay and the potential for further active duty service").

C. *The weight of authority*

As already noted, there is no controlling precedent directly on point. The Federal Circuit and the Court of Claims have in the past considered cases involving the TDRL as well as cases involving the tolling provision, though never addressing the effect of the former on the latter. Of the three non-binding cases that have addressed the precise issue before us here, two have concluded that the tolling provision applies to time spent on the TDRL. *Mason v. Texaco, Inc.,* 862 F.2d 242 (10th Cir. 1988); *Cruz v. Gen. Motors Corp.*, 308 F. Supp. 1052 (S.D.N.Y. 1970). The third, and most recent decision to address the issue, was that of another judge of the Court of Federal Claims, *Dean v. United States*, 92 Fed. Cl. 133 (2010), who reached the opposite conclusion.

---

[10] We recognize that the Uniform Code of Military Justice expressly applies to both active duty servicemembers and retirees, and its applicability thus does not indicate that TDRL status is one or the other. We simply note that a member on the TDRL maintains a substantial nexus with the military.

As an initial matter, we note that many cases discussing the tolling provision couch their analysis in terms of whether the servicemember was on active duty. *See, e.g., Dambrava v. Office of Pers. Mgmt.*, 466 F.3d 1061 (Fed. Cir. 2006); *Bickford*, 656 F.2d 636; *Diamond v. United States*, 344 F.2d 703 (Ct. Cl. 1965). This, however, is no indication that *only* active duty service triggers the tolling provision, particularly when the statute itself expressly includes certain absences from duty. Rather, regarding these cases, we note that prior to December 19, 2003, the statute setting out the crucial definition of military service read as follows: "The terms 'active service' or 'active duty' shall include the period during which a person in military service is absent from duty on account of sickness, wounds, leave, or other lawful cause." 50 U.S.C. app. § 511(1) (2003). In other words, the term "active duty" was defined to include the type of health-related absences ostensibly at issue here.[11]

1.  *Diamond*

The parties thoroughly discuss *Diamond*, a case that analyzes the tolling provision but which does not implicate the TDRL. In that case, plaintiff was discharged from the Army after five years of service. 344 F.2d at 704-05. Almost immediately thereafter, he joined the Air Force, where he served for two years before being discharged for physical disqualification in 1949. On the same day as his discharge, Mr. Diamond sought to reenlist in the Army but was denied. After more than a decade out of service, Mr. Diamond brought suit in 1961, claiming that his attempted reenlistment was wrongly denied and that he should therefore be credited with "constructive service" to toll the statute of limitations during the 11 years prior to filing suit. The court held that he had not been in military service since 1949 and that the tolling provision did not apply. *Id.* at 706 ("Plaintiff's release from active duty terminated his 'period of military service.'").

The facts of *Diamond* are so different from Ms. Cronin's as to make the holding inapplicable. In *Diamond*, plaintiff's release from active duty coincided with his complete separation from the armed forces and the assumption of civilian status. Mr. Diamond's military service was unquestionably at an end, and the tolling provision clearly does not apply to

---

[11] On December 19, 2003, the statute was amended to its current version, which defines military service as both active duty and, separately, any period of absence on account of sickness, wounds, leave, or other lawful cause. *See* 50 U.S.C. app. § 511.

11

veterans after their discharge or retirement. This does not mean, however, that *every* release from active duty marks the end of the member's military service. As we have noted, it is anticipated that some members on the TDRL will return to active duty military service.

### 2. *Dambrava*

*Dambrava*, another case cited extensively by the parties, analyzes the TDRL but not the tolling provision. In that case, Mr. Dambrava, a military veteran who later entered federal civil service, sought to retire from his civilian position under the Civil Service Retirement Act ("CSRA"). *Dambrava*, 466 F.3d at 1061. The Office of Personnel Management denied his request because he did not have 30 years of creditable service. Dambrava protested that four years he spent on the TDRL while in the Army should count toward his years of service. The Federal Circuit held that time spent on the TDRL was not "active service" as required by the CSRA and thus did not count toward the years of service needed for civil retirement. It noted that time on the TDRL is more "akin to inactive duty or retirement" than it is to active duty. *Id.* at 1063.

The holding was premised on a statute very different from the one at issue here. Specifically, the *Dambrava* court was interpreting the CSRA, which allowed credit only for time spent in "'honorable active service in the armed forces.'" *Id.* at 1063 (quoting 5 U.S.C. § 8331(13)(A) (2000)). In contrast, the SCRA's tolling provision is broader, encompassing leave and health-related absences. The distinct question here is not whether time on the TDRL is active duty, but whether it constitutes an absence on account of sickness, wounds, leave, or other lawful cause. As explained earlier, while the TDRL may resemble inactive duty, the statute at issue here—unlike that in *Dambrava*—encompasses such non-active duty service.

### 3. *Craft*

The plaintiff in *Craft*, after returning from Vietnam, was placed on the TDRL based on evidence of schizophrenia. *Craft v. United States*, 544 F.2d 468, 470-71 (Ct. Cl. 1976). After spending four years on the TDRL, he was discharged. Mr. Craft filed suit seeking reinstatement, back pay, and correction of his records. The Court of Claims found that the evidence the Army relied upon for his discharge was insufficient and ordered that he be reinstated. In its discussion, the court characterized the TDRL as a "limbo

status" during which "a serviceman is actually separated from the military." *Id.* at 476.

We are not convinced that this language from *Craft* settles the matter. The court recognized that members on the TDRL collect military pay and noted that the final determination of the member's status is deferred pending further medical evidence. In addition, the *Craft* court was not considering the tolling provision at issue here with its broad definition of military service. The Federal Circuit has interpreted *Craft's* "actually separated" language as standing for the proposition that "TDRL service is not active duty." *Dambrava*, 466 F.3d at 1064 (citing *Craft*, 544 F.2d at 476). We believe the language in *Craft* is but a recognition that TDRL is a unique status distinct from active duty, a proposition we have already shown to be of limited usefulness in resolving Ms. Cronin's case.

    4.  *Mason* and *Cruz*

The two cases outside our circuit to consider the precise issue presented here held that the tolling provision applied to time spent on the TDRL. In *Cruz*, plaintiff was injured in an automobile accident while on active duty in 1964. He was subsequently hospitalized and transferred to the TDRL for about six months before being permanently retired in 1965. He subsequently sued General Motors in 1967 alleging design and manufacturing defects in the vehicle he had been driving as well as a breach of warranty. The first issue addressed by the court was whether the SSCRA tolled the statute of limitations during the time Mr. Cruz was on the TDRL.

The court concluded that it was undisputed "that as a result of the injuries sustained he was 'absent from duty' and for 'lawful cause.'" *Cruz*, 308 F. Supp. at 1055. The court noted the tolling provision's broad definition of military service[12] and stated that a more narrow definition of active duty elsewhere in the code was not dispositive. In describing the TDRL, the court noted that "[d]uring this interim period [plaintiff] has not been discharged from service, but his status is subject to final disposition by the Navy." *Id.* at

---

[12] See note 11 and accompanying text. Under the statute then in place, the tolling provision applied to active service, which was defined to "include[] the period [plaintiff was] absent from duty 'on account of sickness.'" *Cruz*, 308 F. Supp. at 1055.

13

1056. The court concluded that Mr. Cruz "was lawfully 'absent from duty' on account of his injuries" while on the TDRL:

> [The SSCRA], which defines the period of limitary [sic] service in broad terms, including, as already noted, the period of absence from duty on account of sickness, supports, if indeed it does not compel such a conclusion, and any doubt must be resolved in favor of a broad reading to benefit the injured serviceman.

*Id.* (internal citations omitted).

In *Mason*, the Tenth Circuit reached the same conclusion. Plaintiff in that case was diagnosed with leukemia as a result of exposure to certain toxic substances in the course of his work in the Coast Guard. After 18 months on the TDRL, he was permanently retired and died shortly thereafter. The Tenth Circuit framed the issue as whether placement on the TDRL was a discharge from active service or merely an absence from duty on account of sickness. Relying largely on *Cruz*, the court held that "placement on the 'temporary disability retired list' constitutes 'absen[ce] from duty on account of sickness' under the Act," and tolls the state statute of limitations. *Mason*, 862 F.2d at 245 (citing *Cruz*, 308 F. Supp. 1052).

### 5.    *Lowe* and the role of the DD Form 214

The government, however, argues that *Mason* and *Cruz* are distinguishable because neither of those cases involved the issuance of a DD Form 214, a document Ms. Cronin received simultaneously with her placement on the TDRL. By statute, a member of the armed forces "may not be discharged or released from active duty until his discharge certificate or certificate of release from active duty" and final pay are ready to be delivered. 10 U.S.C. § 1168(a). DD Form 214 implements that statutory directive and serves as the certificate of release. 32 C.F.R. § 45.1(b) (2011). Together with Forms 214ws and 215—a worksheet and corrections form, respectively—it is used to "record and report the transfer or separation of military personnel from a period of active duty." *Id.* § 45.2(b). The form serves as a military record as well as a source of information for governmental agencies and future employers. *Id.* Additionally, it provides the servicemember "with a brief, clear-cut record of the member's active service with the Armed Forces at the time of transfer, release, or discharge, or when the member changes status or component while on active duty." *Id.* § 45.2(b)(2).

The government's argument on this point is essentially that the issuance of the DD Form 214 is the equivalent of discharge and thus marks the end of the servicemember's military service. The government argues that *Mason* and *Cruz*, neither of which mention whether a DD Form 214 was issued, are inapplicable here where Ms. Cronin did receive such a document. In addition, the government points to this court's decision in *Lowe* that the "DD Form 214 is thus authoritative in determining when the tolling provision of the SCRA ended." *Lowe*, 79 Fed. Cl. at 225. We are not persuaded that the issuance of a DD Form 214 is dispositive of the issue.

In *Lowe*, plaintiff was scheduled for discharge from the Marine Corps on a specified date. Before the date arrived, however, he was implicated as a provider of illicit drugs to other servicemembers. Accordingly, rather than being discharged, he was retained in active duty in a disciplinary status. Mr. Lowe subsequently fled the military and was in unauthorized absence until his capture by civilian law enforcement 18 months later. Upon being remanded to military custody, he was court martialed and sentenced to ten years confinement. He was formally discharged on February 17, 2004. The issue before the court was whether the SCRA's tolling provision applied to Mr. Lowe's time as a fugitive and inmate. The court held that because Mr. Lowe was not discharged until February 17, 2004, the tolling provision applied until that date.

*Lowe*, however, is distinct in several ways from the case before us. For one, the court found that Mr. Lowe "remained on active duty during his military confinement." *Id.* at 227. In lieu of his scheduled discharge, plaintiff was retained on active duty under disciplinary status, and he remained in that status until the time of his eventual discharge. So long as he was in active duty, as it appears he was, the tolling provision applied. Second, while *Lowe* identified the DD Form 214 as a necessary precondition to discharge, it does not state that the DD Form 214 is synonymous with discharge. Specifically, the court noted that a member cannot be discharged until the form is prepared, and thus "logic dictates that plaintiff could not have been released from active duty before [his discharge date]." *Id.* at 226.[13] Thus, in Mr. Lowe's case, the form was simultaneous with the discharge.

---

[13] The court noted that the precise date of plaintiff's DD Form 214 was unknown, but speculated that it must have been completed and ready for delivery by the date of his discharge. *Id.* at 225-26.

15

We do not believe, nor does *Lowe* state, that the issuance of a DD Form 214 is in every case concurrent with and equivalent to a final discharge or retirement. The pertinent statute establishes a condition precedent: a member may not be discharged *until* a certificate of release is prepared and ready for delivery. 10 U.S.C. § 1168(a). In other words, the certificate is a necessary, but not sufficient, condition prior to discharge. Neither the statute nor the regulation state or imply that the form effects a discharge or retirement. On the contrary, the regulation states that the form can serve other purposes such as documenting a transfer or change in status: "[DD Form 214 provides] a brief, clear-cut record of the member's active service with the Armed Forces at the time of transfer, release, or discharge, or when the member changes status or component while on active duty." 32 C.F.R. § 45.2(b).

Additionally, both the statute and the implementing regulation speak in terms of a release from active duty. *See id.*; 10 U.S.C. § 1168(a). That the DD Form 214 marks the release from active duty does not mean it is a total and permanent separation from military service. In addition, we note that it is possible for a servicemember to receive multiple DD Forms 214 during the course of his service. 32 C.F.R. § 45.3(b)(3). For example, if an enlisted member accepts an appointment as a commissioned officer, he will be provided with a DD Form 214. *Id.* § 45.3(b)(3)(ii). Similarly, when an officer of one branch of the service transfers to another, he too receives a DD Form 214. *Id.* § 45.3(b)(3)(iv).

Finally, and perhaps most tellingly, the regulation expressly contradicts the government's argument. While a DD Form 214 is issued to every member being separated, it "may also be issued under other circumstances." *Id.* § 45.3(b). Furthermore, "DD Forms 214 are not intended to have any legal effect on termination of the member's services." *Id.* Accordingly, we do not believe Ms. Cronin's receipt of a DD Form 214 is controlling. Nor does the absence of discussion of the form in *Mason* and *Cruz* vitiate their persuasiveness.

### 6. Other persuasive sources

Two additional sources provide guidance which supports plaintiff's position. A 1959 decision of the Comptroller General draws a distinction between placement on the TDRL and removal from service. Specifically, it states that officers placed on the TDRL were not eligible to receive a $2,000 incentive payment available to officers who voluntarily retired. 39 Comp. Gen. 108, B-140467, August 18, 1959. "The placement of a navy officer on

the temporary disability retired list under 10 U.S.C. [§] 1202 is not a final and permanent removal from the active list but merely the initial step in a series which may lead to a return to duty, retirement or separation." 39 Comp. Gen. 108, B-140467, August 18, 1959.

Finally, although the legislative history is not particularly enlightening, we note that the most recent amendments to the tolling provision support our conclusion. The bill originally introduced in the House of Representatives omitted the broad language defining military service as including health-related absences and leave. *See* H.R. 100, 108th Cong. (2003). This bill was referred to the Committee on Veterans' Affairs, whose report and amended recommendation likewise omits the pertinent language. *See* H.R. Rep. 108-81 (April 30, 2003). After the bill was received by the Senate, it was referred to the Senate Committee on Veterans' Affairs. The version coming out of that committee and eventually passed into law included the broader definition of military service. Thus it seems to us that the broad definition was intentionally included, and we must give it effect.

## CONCLUSION

For the reasons stated above, we hold that the tolling provision of the SCRA applies to toll the statute of limitations during time spent on the TDRL. Accordingly, Ms. Cronin's claims were timely filed. The parties are directed to confer and file by April 18, 2011, a proposed schedule for further proceedings in this case. In that report, the parties should indicate their views as to whether, in the interest of efficiency and judicial economy, they wish to seek certification of the this ruling for an interlocutory appeal to the Court of Appeals for the Federal Circuit.

s/ Eric G. Bruggink
Eric G. Bruggink
Judge
