# In the United States Court of Federal Claims

No. 06-633

(Filed: December 19, 2012)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

JUDITH LOUISE CRONIN,

                *Plaintiff*,

v.

THE UNITED STATES,

                *Defendant*.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Military pay; disability determination; military promotion; military correction board

    *Jeffery M. Chiow,* Washington, D.C., for plaintiff.

    *Armando A. Rodriguez-Feo*, United States Department of Justice, Civil Division, Washington, D.C., with whom were *Donald E. Kinner*, Assistant director, *Jeanne E. Davidson*, Director, and *Tony West*, Assistant Attorney General, for defendant.

_____

## OPINION

_____

BRUGGINK, *Judge*.

    Plaintiff, Judith Louise Cronin, brings this suit seeking to correct her military records in two regards: (1) to reflect a promotion which she alleges occurred in 1994, and (2) to reflect a higher disability rating based on claims of, *inter alia*, post-traumatic stress disorder ("PTSD"). Both of these corrections, if made, would result in a higher pension payment to plaintiff. The Board for Correction of Naval Records ("BCNR"), the entity responsible for the administration of naval records, denied both requests previously.

Plaintiff first brought suit here on September 7, 2006, challenging the 1996 BCNR decision that denied her promotion-delay claim and the 2004 BCNR's decision that denied her higher disability rating.  On May 16, 2008, we dismissed plaintiff's claims for promotion delay and claims regarding nine of the ten medical conditions for lack of jurisdiction due to the six-year statute of limitations period provided by 28 U.S.C. § 2501 (2000).  Only one of the conditions (PTSD) appeared in the record within the allowable six-year time period.  With respect to the PTSD claim, however, we granted defendant's motion for judgment on the administrative record that the 2004 BCNR's decision was not arbitrary or capricious.  We remanded to the BCNR, however, for the limited purpose of determining whether plaintiff's annuity payments were correct.

On October 10, 2008, the BCNR recalculated plaintiff's annuity and awarded plaintiff $7,198, an additional 137 retirement points to her record, and increased her annuity pay from $2,638 to $2,716 per month.  Upon this administrative correction, we ordered plaintiff to show cause why her complaint should not be dismissed.  She did not respond, and her complaint was accordingly dismissed with prejudice.

Plaintiff appealed to the Court of Appeals for the Federal Circuit, which vacated and remanded.  *Cronin v. United States*, 363 F. App'x 29 (Fed. Cir. 2010).  First, the Federal Circuit instructed us to consider the effects of the Servicemembers Civil Relief Act ("SCRA"), Pub. L. No. 108-189, § 206, 117 Stat. 2835, 2844 (2003) (codified at 50 U.S.C. app. § 526(a)) on the tolling of the statute of limitations.  Second, with respect to the medical conditions, the Federal Circuit noted that, if her claims were not otherwise barred, we should consider the possible affect that PTSD further exacerbated her disabling conditions and not merely whether the PTSD should have been given a higher disability rating.  363 F. App'x at 34.

After reconsideration, we held that the SCRA tolled the statute of limitations.  *Cronin v. United States*, 98 Fed. Cl. 268, 278 (2011).  Based on a request by the parties, however, we remanded to the BCNR to reconsider plaintiff's claims for a higher disability rating in light of the Federal Circuit's decision and "giving due regard to any evidence in her records of PTSD."  We directed plaintiff to submit "a petition to the [BCNR] clarifying her request and explaining any additional arguments or evidence."  *Cronin v. United States*, No. 06-633 (Fed. Cl. May 13, 2011) (order granting remand).

On June 27, 2011, plaintiff submitted a clarifying petition to the BCNR. The BCNR considered, and, on November 18, 2011, denied plaintiff's petition (the "2011 BCNR").

Pending are the parties' cross-motions for judgment on the administrative record and defendant's motion to strike the attachment to plaintiff's response to defendant's cross-motion. We heard oral argument on July 10, 2012. We requested from the parties additional briefing after oral argument. For the reasons explained below, we grant defendant's motion to strike, deny plaintiff's motion for judgment on the administrative record, and grant defendant's cross-motion for judgment on the administrative record.

## BACKGROUND

Plaintiff was an officer in the United States Naval Reserves and served until her retirement on May 31, 1996. Before her retirement, she was selected to be promoted to the rank of commander. The promotion was scheduled to occur on October 1, 1994. Before plaintiff's promotion, however, in August of 1994, a Navy physician wrote a letter stating she was not fit for full duty. This letter does not appear in the Administrative Record. Other official naval records, however, refer to it and describe its contents. *See, e.g.*, Administrative Record ("AR") I at 8.[1] Plaintiff does not challenge this letter's existence or the substance of its contents. In response to that physician letter, the Chief of Naval Personnel, in a letter[2] dated September 30, 1994, notified

---

[1] There are three volumes of the administrative record. Volume I records the 1996 Board of Corrections of Naval Records decision; Volume II records the 1995 and 2000 Physician Evaluation Board decisions; and Volume III records the final decision of the 2011 Board of Corrections of Naval Records.

[2] Plaintiff questions the date of this letter because it states that a "medical board has since reviewed your case and recommended a departmental review." AR I at 8. It is undisputed that the reference is to a document which carries a date of October 5, 1994. AR II at 274. Plaintiff contends that the September 30 date therefore must have been altered. We decline to presume falsification of the September 30 date. It is the October 5 date which shows physical signs of having been changed. In addition, the incentive to falsify, if any, would run in favor of changing the medical board report date to one prior to September 30. We presume the Chief of Naval Personnel saw an earlier

plaintiff that, "in your physician's opinion, you are not fit for full duty." AR I at 8. Citing to Secretary of Navy Instruction 1420.1A, which concerns the promotion of officers, the Chief's letter further stated, "you are hereby notified that the Chief of Naval Personnel has approved the delay of your [October 1, 1994] permanent promotion to commander . . . ." *Id.* The letter also provided that plaintiff could submit a statement to the Chief of Naval Personnel via her commanding officer challenging the delay of promotion within ten days of receipt of the letter. It is undisputed that plaintiff did not receive this letter until October 14, 1994. She responded on October 26, 1994.[3] AR I at 10.

Plaintiff's case was subsequently referred to the Navy's Disability Evaluation System ("DES"), and then, in October 1995, her case was referred to the Physical Evaluation Board (the "1995 PEB"). The 1995 PEB found that plaintiff was "[p]hysically [u]nfit to perform the duties of [her] office, grade, rank and rating," AR II at 204, and issued her a disability rating of sixty percent. *Id.* Her conditions were divided into three categories: (1) unfitting conditions, (2) conditions that contribute to the unfitting conditions, and (3) conditions that are not separately unfitting and do not contribute to unfitting conditions. In category 1, unfitting conditions, the PEB noted that plaintiff had a calcaneal spur, a ganglion cyst, and bipolar disorder. In category 2, due to surgery, plaintiff previously had portions of her "lateral ridge," removed, which contributed to ankle and foot pain. In category 3, the PEB placed migraines and carpal tunnel syndrome ("CTS"). The PEB provided a detailed rationale for its decision of placing plaintiff's conditions in their respective categories. *See* AR II at 204-218. Based on its disability findings and its inability to find her conditions either stable or permanent, the 1995 PEB placed plaintiff on the temporary disability retired list ("TDRL"), which accorded her disability benefits.

On January 4, 1996, plaintiff challenged the delay of her pending promotion to Commander at the BCNR ("1996 BCNR"). AR I at 4. In

---

version of the medical board report. In any event, in view of our holding below that there was no formal appointment, there could not have been an automatic promotion.

[3] We ascribe no consequence to the fact that plaintiff did not receive the September 30 letter prior to removal of her name from the promotion list. The Navy took no further action before she responded and plaintiff was able to make her arguments.

connection with her challenge, the Bureau of Naval Personnel furnished the BCNR with an advisory opinion on the merits of plaintiff's application. AR I at 21-22. The advisory opinion noted that plaintiff's promotion was properly delayed due to the expressed medical concern that she was not fit for full duty, as further supported by the subsequent findings of the 1995 Physician Evaluation Board. *Id.* The 1996 BCNR substantially adopted the findings of the advisory opinion and denied plaintiff's request on May 16, 1996. *Id.* at 1.

Shortly thereafter, on May 31, 1996, plaintiff was discharged from active duty, retired, and simultaneously promoted to the rank of Commander. AR II at 103. She was rated as 60% disabled, based on heel and ankle injuries and bipolar disorder. *Id.* at 104.

Because plaintiff continued to be on the TDRL, she was subject to re-evaluation of her physical conditions every 18 months. By statute, this periodic re-evaluation continued until the earliest occurrence of the following: (1) the condition was determined to be stable and permanent, (2) the condition improved so that she was fit for duty or that her rating was less than thirty percent, (3) or the statutory maximum of five years had elapsed, at which point the final disability rating would have been given. *See* 10 U.S.C. § 1210 (2006). A TDRL medical reevaluation board met on January 6, 2000 and diagnosed six conditions: calcaneal spur, bipolar disorder ("single episode, mixed severe without psychotic features in partial remission"), ganglion cyst, removal of lateral ridge, carpal tunnel syndrome ("without EMG evidence of nerve compromise"), and classic migraine. AR II at 15. On March 1, 2000, the follow-on informal PEB found her unfit for duty, because her conditions had not stabilized. It nevertheless lowered her disability rating from sixty to fifty percent based only on bipolar disorder and a calcaneal spur, and no longer on a ganglion cyst. Plaintiff disagreed with that determination and requested a formal hearing.

On August 11, 2000, the PEB (the "2000 PEB") issued its formal decision. AR II at 12. The 2000 PEB found that plaintiff was still medically unfit for her military duties and considered the same six diagnoses as before: (1) calcaneal spur, (2) bipolar disorder, (3) ganglion cyst, (4) removal of lateral ridge, (5) carpal tunnel syndrome, and (6) migraines. There were seven evidentiary exhibits consisting of various medical records and plaintiff's PEB case file. The PEB gave her calcaneal spur a zero disability rating and her bipolar disorder a thirty percent disability rating, for a total unfitting condition disability rating of thirty percent. AR II at 18-19. The board did not find any of her other conditions to be unfitting. Specifically, the Board rejected an

assertion, apparently made for the first time during the 2000 PEB, of post-traumatic stress disorder, finding that it was a new contention and could not have created eligibility at the time plaintiff was placed on TDRL. AR II at 16. Consequently, the 2000 PEB placed plaintiff on the permanent disability retirement list ("PRDL"), thereby permanently retiring her from naval service with thirty percent disability benefits. AR II at 19.

In June 2003, plaintiff filed another petition with the BCNR challenging the 2000 PEB decision. *See* AR I at 83. Plaintiff alleged denial of due process and violations of the Navy Disability Evaluation System. She attached seven documents to her application, including a summary list of incidents of significant trauma while in Navy service to support her PTSD. The BCNR considered her petition on August 5, 2004 (the "2004 BCNR"). AR I at 85. The Director of the Naval Council of Personnel Boards submitted an advisory opinion on the merits of her new petition. AR I at 93-98. With regard to the bipolar disorder rating, which plaintiff sought to increase from thirty to fifty percent, the advisory opinion noted that a 1998 TDRL evaluation reported "an absence of manic or hypomanic symptoms," and that plaintiff had "taken no medication since her [hospital] discharge [in December 1995]." AR I at 96. The report thus supported the finding that plaintiff was largely in remission, which led the 2000 PEB to lower the bipolar rating to thirty percent. The advisory opinion acknowledged that some of plaintiff's Department of Veterans' Affairs ("VA") proceedings noted symptoms of bipolar disorder. The opinion also referenced a sexual trauma report from a licensed clinical social worker, which, although failing to mention any bipolar disorder, attributed plaintiff's symptoms to PTSD. AR I at 97. In any event, the advisory opinion noted that the 2000 PEB's thirty percent bipolar rating likely "include[d] some impairment incident to [plaintiff's] diagnosed PTSD." *Id.*

Turning to plaintiff's PTSD claim, the advisory opinion found: "Petitioner presents a compelling, articulate narrative in support of both the existence and service connection of [PTSD]. However, sadly, documentation is lacking of both the alleged principle [sic] egregious evoking stressors and that this condition was separately unfitting at the time of her placement on the TDRL." *Id.* Because her PTSD was first diagnosed in January 1998–one and a half years after her placement on the TDRL–under applicable regulations, plaintiff had to demonstrate that the condition was unfitting at the time she was placed on the TDRL. According to the advisory opinion, plaintiff failed to meet this burden.

The advisory opinion dismissed plaintiff's other claims relating to the ganglion cyst (because she had full range of motion), carpal tunnel (because no health records demonstrated it was present when she was placed on the TDRL), migraines (because she had a 15-year history of migraines prior to the initial PEB and they were "fairly well controlled"), and temporomandibular joint disorder ("TMJ") (because plaintiff proffered insufficient evidence to prove this was separately unfitting at time of TDRL).  AR I at 97-98.

The 2004 BCNR substantially concurred with the advisory opinion, thus denying plaintiff's request.  AR I at 85-86.  It further held that the fact that the VA rated some conditions not rated by the Navy was not probative of error because the VA rates all conditions arising during military service, not just those that affect fitness to perform military duty.

## DISCUSSION

Plaintiff's motion for judgment on the administrative record argues that the BCNR acted arbitrarily and capriciously in rejecting her claims that she was entitled to an earlier promotion and that her disabilities warranted a higher rating.  She seeks (1) back-pay for her promotion, which she argues occurred on October 1, 1994, and (2) a 100% disability rating based on the conditions considered by the BCNR.[4]

We may set aside BCNR decisions only if they are arbitrary, capricious, contrary to law, or not based on substantial evidence, *see Fisher v. United States*, 402 F.3d 1167, 1180 (Fed. Cir. 2005); *Martinez v. United States*, 333 F.3d 1295, 1314 (Fed. Cir. 2003), which plaintiff must show by "cogent and clearly convincing evidence." *Kirwin v. United States*, 23 Cl. Ct. 497, 502 (1991).  Consequently, our review "does not require a reweighing of the evidence, but a determination whether *the conclusion being reviewed* is supported by substantial evidence." *Heisig v. United States*, 719 F.2d 1153, 1157 (Fed. Cir. 1983).  Due to the military interests involved, moreover, "military administrators are presumed to act lawfully and in good faith like other public officers, and the military is entitled to substantial deference in the governance of its affairs." *Dodson v. United States*, 988 F.2d 1199, 1204 (Fed.

---

[4] The ten conditions are: right heel condition, left ankle injury, carpal tunnel syndrome, bipolar disorder, migraines, Sjögren's syndrome, fibromyalgia, TMJ, chronic pain, and PTSD.

Cir. 1993); *accord Stine v. United States*, 92 Fed. Cl. 776, 791 (2010) (stating that a presumption of regularity "attaches to the actions of the BCNR").

I.     Promotion Claim

Plaintiff argues that she was "promoted on October 1, 1994[,] by operation of law," because she was nominated by the President, confirmed by the Senate, and remained on the promotion list on the effective date of promotion. Pl.'s Mot. J. Admin. R. 19, Feb. 2, 2012.  This argument fails, however.

As famously elucidated in *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803), three separate actions are ordinarily required for appointment, including of naval officers, under the U.S. Constitution art. II, § 2, cl. 2.  First, the President must nominate the individual to the post.  *See id.* at 155-56. Second, the Senate must confirm the nominee.  *Id.* Third, the President must appoint the officer.  *Id.*  As the Federal Circuit has held, "[e]ach discrete action–nomination, confirmation, and appointment–must be made for a promotion to be effective."  *Dysart v. United States*, 369 F.3d 1303, 1311 (Fed. Cir. 2004).  There is no dispute here that the first two steps occurred. The dispute focuses on the third step, appointment.

Expounding on this third step, the Federal Circuit in *Dysart*, while explaining the process applicable to admirals, noted, "[i]f the nominee is confirmed, the President appoints the officer and signs a commission or performs some other public act as evidence of the officer's appointment." 369 F.3d at 1306 (citing *Marbury*, 5 U.S. (1 Cranch) at 157).  In this case, the publication that notified plaintiff of her selection for promotion carried the following caveat: "THIS MESSAGE IS NOT AUTHORITY TO DELIVER APPOINTMENTS.   AUTHORITY TO EFFECT PROMOTION WILL NORMALLY BE ISSUED BY FUTURE [Naval Announcements] REQUIRING [Delivery of Temporary/Permanent Appointment Form] PREPARATION AND FORWARDING OF DOCUMENT TO [Navy Personnel Command]."  AR III at 124.  Just like in *Marbury* and *Dysart*, therefore, the Navy contemplated preparing and delivering to plaintiff at a later date an appointment form that would serve as the actual commission effectuating the promotion.  This was the process used to effectuate all of plaintiff's previous promotions to lieutenant junior grade, lieutenant, and lieutenant commander.  AR III at 554, 558, 559.

The parties do not dispute that an appointment form to commander was never completed nor delivered to plaintiff. Plaintiff underestimates the gravity of this point. The actual execution and delivery of that appointment are essential because "[t]he Constitution contemplates that, after confirmation, the President may refuse to execute the appointment." *Dysart*, 369 F.3d at 1316. Because the appointment power rests solely within the discretion of the President, moreover, we have "no general supervising power" to mandate an appointment. *See id.* (citation and quotation omitted).

Despite the absence of an appointment or commission, plaintiff contends that her "frocking" ceremony constitutes the final public act contemplated in *Marbury*, consummating her appointment. Frocking is a ceremony that entitles a Naval officer to wear the rank and insignia of a rank before formal promotion. The frocking regulations are contained in Navy Military Personnel Manual ("MILPERSMAN") 2220130 (effective date December 30, 1993). Plaintiff points to subsection 5(h), which provides in part: "you are authorized to assume the title and wear the uniform of a [applicable grade, e.g., commander], U.S. Navy/Naval Reserve. You are entitled to all the privilege of that grade except entitlements restricted by law. . . ." MILPERSMAN 2220130, § 5(h). Plaintiff argues that because she was frocked into the commander grade, she is entitled to commander pay. This argument ignores the express language contained in subsection 5(h), which provides, "[s]pecifically, you are not entitled to the pay or other allowances of a [commander] . . . ." The frocking regulations in the same section further provide that "[t]he frocked officer has not been promoted and does not accrue any additional monetary entitlements, gain seniority, accumulate time in the higher grade, nor assume the legal authority of the higher grade." *Id.* at § (5)(a). In fact, an officer may still refuse a promotion after frocking. *Id.* at § (5)(d). It is clear, therefore, that frocking cannot substitute for the actual appointment of an officer.

Because plaintiff was never formally appointed and because frocking does not serve as an substitute for appointment, plaintiff was not actually promoted. The Federal Circuit has been clear on this point: "'the President's decision not to appoint is a discretionary act that cannot be reviewed by a court . . . .'" *Lewis v. United States*, 458 F.3d 1372, 1377 (Fed. Cir. 2006) (quoting *Dysart*, 369 F.3d at 1317). Plaintiff's argument that she was promoted by operation of law thus fails.

Although no court could force the President to exercise his appointment power, that does not mean that plaintiff's promotion claim lacks any possible

9

redress.  The Federal Circuit has held that, "[i]f an individual has a 'clear cut legal entitlement' to a position, but subordinate officials in the government misinterpret the Constitution, statutes, or regulations, and improperly decline to recommend that individual for nomination or appointment, redress may be available . . . ." *Lewis*, 458 F.3d at 1377 (quoting *Smith v. Sec'y of the Army*, 384 F.3d 1288, 1294-95 (Fed. Cir. 2004)).  This redress is an action for money damages under the Military Pay Act in this court.  *See id.* at 1377 n.6; *see also Smith*, 384 F.3d at 1294-95.

Plaintiff thus argues that the Secretary of the Navy and his subordinate officers misconstrued their own regulations in delaying plaintiff's promotion due to medical reasons.  This argument is also unpersuasive.  The parties agree that the applicable regulation governing the delay of naval officer promotions is Secretary of the Navy Instruction ("SECNAVINST") 1420.1A (effective date January 8, 1991).[5]  SECNAVINST 1420.1A, paragraph 23(a) provides that the Chief of Naval Personnel or a member's commanding officer "may delay the appointment of an officer selected for promotion."  It further provides that "[p]romotion may be delayed under this instruction if . . . [t]here is cause to believe that the officer is mentally, physically, morally, or professionally unqualified."  SECNAVINST 1420.1A, ¶ 23(a)(5).  As noted in its letter dated September 30, 1994, the Navy delayed plaintiff's promotion due to its concern about her physical fitness for duty.  This concern arose based on a report by plaintiff's physician.

---

[5] The parties disagree as to which statutes govern plaintiff's promotion. Plaintiff cites to 10 U.S.C. § 624 and 10 U.S.C. § 14311.  The government contends that these statutes are inapplicable to plaintiff's case, and we agree. 10 U.S.C. § 14311 was enacted on October 5, 1994, but did not become effective until October 1, 1996, which is after the time period relevant here. *See* Pub. L. No. 103-337, § 1691(b), 108 Stat. 2663, 3026 (Oct. 5, 1994).  10 U.S.C. § 624, as the BCNR noted, is inapplicable to plaintiff because it applies only to officers on the "active-duty list"; plaintiff was not.  *See* AR III at 6. Moreover, it is important to note that, even to the extent these statutes could apply, they cannot "require the President to exercise his appointment power." *Dysart*, 369 F.3d at 1317.  As we explained above, no appointment occurred here.  In any event, although the parties disagree as to which statute applies, they agree that SECNAVINST 1420.1A applies to promotion announcements, procedures, and permissible delays.

That report had ample support in plaintiff's prior medical history. Based on medical concerns, plaintiff was assigned to limited duty until September 12, 1994, by medical boards in November 1993 and April 1994. *See* AR II at 245, 283-84.  The April 1994 medical board noted that her limited duty meant "no prolonged standing, no prolonged walking, no running, no participation in physical training or physical readiness testing, no marching, no field duties . . . ." AR I at 5.  She was scheduled for additional heel surgery on September 16, 1994–two weeks before her scheduled promotion–with surgical staples to be removed on September 28, 1994.  *See* AR I at 32.  A surgical post-op was to be conducted on October 18, 1994.  Because of this surgery, moreover, she was on convalescent leave.  The already-existing limited duty status of plaintiff due to prior surgeries and other medical reasons, her September 1994 surgery and convalescent leave within weeks of her promotion date, and a letter from her physician questioning her fitness for duty, all support the Navy's determination that there was "cause to believe" that she may have been physically unfit for duty as of the end of September 1994.  *See* AR I at 29-33.

Plaintiff responds that she was not formally adjudicated medically unfit before October 1, 1994.  Formal adjudication, however, is not the relevant standard.  Paragraph 23 of the regulations requires only "cause to believe" the individual is medically unqualified for promotion.  The regulation clearly contemplates a holding period for further evaluation.

Plaintiff points instead to MILPERSMAN 2220150 (effective date March 5, 1993), which governs the standards for physical examinations for promotion of commissioned officers.  It provides that an officer may not be promoted "until, as reflected by the officer's most recent physical examination, the commanding officer has determined that the officer is physically qualified for promotion."  MILPERSMAN 2220150 § 1.  Plaintiff argues that, because she received passing fitness reports during her period of limited duty, she could not later be delayed on the account of physical unfitness.  We disagree.  Such a construction of MILPERSMAN 2220150 § 1 would ignore the more specific authority granted in SECNAVINST 1420.1A, paragraph 23(a), which gives the Navy a certain degree of flexibility to delay the promotion of an officer if it has cause to believe that a current medical concern exists.  It would be inappropriate for the court to second guess the determination that plaintiff's then-current medical condition, which included foot surgery in September and a period of convalescence, interfered with her qualification for promotion.

11

Plaintiff's last attack on the Navy's decision to delay her promotion is that the length of the delay violates SECNAVINST 1420.1A, paragraph 23(d), which allows promotion delays of up to six months unless the Secretary approves an extension, with an 18-month maximum. Plaintiff's initial delay was effective on October 1, 1994. On March 9, 1995, the Chief of Naval Personnel sent a request to the Secretary of the Navy to extend the delay. *See* AR I at 14. That request was approved on March 21, 1995, which is before the expiration of the six-month limit. *Id.* The Navy issued her final retirement orders on March 29, 1996, which is prior to the applicable 18-month time period. The defendant argues, and we agree, that plaintiff's retirement orders represented the last possible action the Navy could take with respect to plaintiff's promotion, as she was not otherwise entitled to it. Thus, the Navy took its final action with respect to plaintiff's promotion within the applicable 18-month time period.

## II.   Disability Claims

Plaintiff also requests that the court order the Navy to correct her record to reflect a higher disability rating. She contends that the 2000 PEB, 2004 BCNR, and 2011 BCNR erred in making or upholding her current disability rating at thirty percent. Her complaint before this court and below involve ten medical conditions: (1) calcaneal spur, (2) ganglion cyst, (3) migraines, (4) carpal tunnel syndrome, (5) temporomandibular joint disorder, (6) Sjögren's syndrome, (7) fibromyalgia, (8) chronic pain, (9) bipolar disorder, and (10) post-traumatic stress disorder. We first evaluate plaintiff's theory that medical conditions considered in tandem can render a service member unfit, then we address defendant's argument that plaintiff waived the right to judicial review of several medical conditions, and lastly, we consider the applicable rules and each disability in turn.

### A.  Effect of Multiple Disabilities

Plaintiff contends that her conditions should be viewed through the prism of SECNAVINST 1850.4D, paragraph 3804(k), which states that "[a] member may be determined [u]nfit as a result of the overall effect of two or more impairments even though each of them, standing alone, would not cause the member to be referred into the DES or be found [u]nfit because of physical disability." In effect, plaintiff suggests that, even though a given condition might not be disabling, when considered in tandem with some other non-disabling condition, that the two, through a gestalt process, produce a disabling effect and entitlement to a higher disability rating from the Navy.

12

We do not believe that paragraph 3804(k) operates in a manner that would neutralize the other provisions of SECNAVINST 1850.4D. We construe the regulation in the context of 10 U.S.C. § 1201 (1994), which conditions disability retirement compensation on a finding that a service member is "unfit to perform the duties of his office, grade, rank, or rating because of physical disability incurred while entitled to basic pay." 10 U.S.C. § 1201. The statute goes on to define the determination of unfitness as having three elements, one of which is that the "disability is at least 30 percent under the standard schedule of rating disabilities in use by the [VA] at the time of the determination." 10 U.S.C. § 1201(B). The import of paragraph 3804(k) is that disabling conditions that individually would not reach the thirty percent rating may combine to reach thirty percent, rendering the service member unfit. The regulation does not imply that a smattering of unratable or zero percent conditions can combine to warrant a rating sufficient for disability payments. Thus, we must evaluate plaintiff's disabilities individually.

B. Waiver

Defendant argues that plaintiff waived her right to advance several of the conditions she presents to the court: Sjögren's syndrome, fibromyalgia, temporomandibular joint disorder, and chronic pain. Defendant's briefing papers leave some confusion as to how it contends waiver operates in this case. The first brief seems to argue that plaintiff waived a right to complain about her conditions by failing to raise them before the 1995 PEB, and the second brief seems to argue that she waived them by not bringing them before the 2000 PEB. *Compare* Def.'s Resp. & Cross-Mot. 26-27, *with* Def.'s Reply 13-15. We disagree with either view.

Most of the cases cited by defendant involve determining the point at which the statute of limitations begins to run, not whether there was a waiver. For example, defendant states that "failure to present a known condition to a medical board can result in waiver if the service member has 'sufficient actual or constructive [notice] of his disability.'" Def.'s Reply 14, June 15, 2012 (quoting *Chambers v. United States*, 417 F.3d 1218, 1226 (Fed. Cir. 2006)). The full quote from *Chambers* suggest something different: "[F]ailure can invoke the statute of limitations when the service member has sufficient actual or constructive notice of his disability." 417 F.3d at 1226. Other cases are to the same effect. *See Real v. United States*, 906 F.2d 1557, 1561-62 (Fed. Cir. 1990) (inquiring as to the level of knowledge necessary for the limitations period to commence); *Miller v. United States*, 175 Ct. Cl. 871, 879-80 (1966) (holding that the statute of limitations barred a suit to correct military records);

13

*Colon v. United States*, 71 Fed. Cl. 473, 481-82 (2006) (noting that, if *Real* applied, "the statute of limitations . . . should have begun to accrue"). Because this court previously held that the statute of limitations was tolled while plaintiff was on the TDRL, she began her suit in a timely manner and has not, under any of these authorities, waived any of the conditions which she presents today. *See Cronin*, 98 Fed. Cl. at 278 (holding that the SCRA tolled the statute of limitations while plaintiff was on the TDRL).

Only three of the authorities mentioned by defendant support waiver without involving the statute of limitations. *See Metz v. United States*, 466 F.3d 991, 999-1000 (Fed. Cir. 2006) (holding that plaintiff had waived an argument because he did not make it before a military records correction board); *Doyle v. United States*, 599 F.2d 984, 1000 (Ct. Cl. 1979) (holding that plaintiffs had waived an objection since they knew about and chose not to present it before a Correction Board); *Spehr v. United States*, 51 Fed. Cl. 69, 85-86 (2001) ("A claimant's failure to raise an issue during BCMR proceedings constitutes a waiver of the issue in this court."). These cases look to whether a plaintiff brought arguments before a military record corrections board such as the BCNR, not before a PEB. Defendant may have been able to succeed with a waiver argument with respect to fibromyalgia, Sjögren's snydrome, and chronic pain because plaintiff did not present those conditions to the 2004 BCNR before bringing them before this court. AR I at 104-106. However, she did present all ten of her conditions to the 2011 BCNR. AR III at 22. Hence, plaintiff has not waived arguments concerning any of her conditions in so far as respects the present motions for judgment on the administrative record.

C.  Applicable Standards

The Navy's Disability System ("DES")[6] acts independently from the Veterans Affairs Schedule for Rating Disabilities ("VASRD"). Therefore, some conditions that require ongoing treatment and might be compensable by the VA may nevertheless not create entitlement to Navy disability compensation.[7] This is because a disability must be determined to be unfitting

---

[6] In 2000, the DES was located in SECNAVINST 1850.4D.

[7] Sections of the DES contemplate the distinction mentioned above, including paragraph 1001(f) and the requirements for periodic examination reports in paragraphs 3614 and 3615.

before it is "rated" by the Navy.  *See Poole v. United States*, 64 Fed. Cl. 776, 783 (2005) ("[T]o qualify for a disability retirement benefit, the Army must first determine that a soldier is not fit for service.").  Additionally, rating for disability retirement from the Navy serves a purpose distinct from ratings under the VA system.  SECNAVINST 1850.4D, paragraph 1001(h) clarifies that a diagnosis or symptoms similar to those mentioned on the VASRD do not automatically render a service member unfit for duty.  Paragraph 1001(h) states that

> the member is Fit to continue naval service based on evidence which establishes that the member is able to reasonably perform the duties of his or her office, grade, rank or rating, to include duties during a remaining period of Reserve obligation.  Within a finding of Fit to continue naval service is the understanding that the mere presence of a diagnosis is not synonymous with a disability. It must be established that the medical disease or condition underlying the diagnosis actually significantly interferes with the member's ability to carry out the duties of his or her office, grade, rank or rating.

This requirement that a condition be unfitting prior to being rated marks an important difference between the Navy's ratings and the VA's ratings, which primarily employ a "service connection" standard. 38 C.F.R. § 3.303(a) (2011). The VA regulations allow a "service connection" status when the facts "establish that a particular injury or disease resulting in disability was incurred coincident with service in the Armed Forces, or if preexisting such service, was aggravated therein." *Id*.  In short, plaintiff may receive compensation for more disabilities through the VA rating system than with the Navy because some conditions  may meet VA standards and yet not be unfitting for purposes of Navy disability retirement.

Other sections of the DES complement this understanding.  For example, SECNAVINST 1850.4D, paragraph 4111 instructs Physical Evaluation Boards to classify all diagnosed conditions into one of four categories. Category 1 includes "[a]ll [u]nfitting [c]onditions"; Category 2 includes those conditions that contribute to the conditions in Category 1; Category 3 includes conditions that are not independently unfitting and do not contribute to other disabling conditions; Category 4 includes those conditions that do not constitute physical disabilities.

As of 1995, the status of the ten conditions that plaintiff now advances was:

| Category 1 | Category 2 | Category 3 | Category 4 | Not Considered |
|---|---|---|---|---|
| Calcaneal Spur<br><br>Ganglion Cyst<br><br>Bipolar Disorder | | Migraine<br><br>Carpal Tunnel Syndrome | | TMJ<br><br>Sjögren's Syndrome<br><br>Fibromyalgia<br><br>Chronic Pain<br><br>PTSD |

AR II at 204-05.

The initial categorization of a condition determines which standard is applicable to its future review. For example, Category 1 and 2 conditions (calcaneal spur, ganglion cyst, and bipolar disorder) are reevaluated throughout the TDRL and at the final PEB are assigned ratings according to the then-current VASRD. SECNAVINST 1850.4D, ¶ 1001(f). Conditions that were not initially considered (TMJ, Sjögren's syndrome, fibromyalgia, chronic pain, and PTSD) may meet the definition of a "new diagnosis" in SECNAVINST 1850.4D, paragraph 3618, which states:

> Conditions newly diagnosed during TDRL periodic physical examination shall be compensable upon finalization when:
>
> a. The condition is Unfitting; and
>
> b. The condition was caused by the condition for which the member was placed on the TDRL, or directly related to its treatment; or
>
> c. The evidence of record establishes that the condition either was incurred while the member was entitled to basic pay, or as the proximate result of performing duty, whichever is applicable, and was an Unfitting disability at the time the

member was placed on the TDRL. Otherwise such conditions
shall be deemed Unfitting due to the natural progression of the
condition and noncompensable under chapter 61 of 10 U.S.C.
(reference (a)), although the member may be eligible for benefits
for these conditions under the DVA.

In other words, the DES expressly provides for the possibility of compensation
for new diagnoses that are unfitting and arise while the member is on TDRL
if those new diagnoses were either caused by a "condition for which the
member was placed on TDRL" or "incurred while the member was entitled to
basic pay or as a proximate result of performing duty, whichever is applicable,
*and was an unfitting disability at the time the member was placed on the TDRL
but was not included in the Medical Board report or not rated*."
SECNAVINST 1850.4D, paras. 3618; 3804b(1)(b) (emphasis added).

While the SECNAVINST permits compensation for new diagnoses as
explained above, some of plaintiff's conditions were already diagnosed at the
time she was placed on the TDRL and were classified as not unfitting
(Category 3, i.e. migraine and carpal tunnel syndrome). The regulations do not
expressly indicate what legal standard the 2000 PEB and the 2004 and 2011
BCNRs should have applied to these Category 3 conditions. The regulations
also fail to describe when those conditions that existed at the time plaintiff was
placed on TDRL had to become unfitting in order to be rated.

Because of these ambiguities in the regulations, the court ordered the
parties to submit supplemental briefings covering these questions: (1) what
standard is applicable to a condition that does not fit the definition of "new
diagnosis"; (2) when do conditions have to become unfitting in order to be
rated; and (3) did the 2011 BCNR's application of SECNAVINST 1850.4D,
paragraph 3618 constitute prejudicial error.

1.  The Standard for Category 3 Conditions

Plaintiff attempts to answer the first question by pointing the court to
a series of cases, which stand for the proposition that this court should review
the PEB and BCNR decisions for whether they were arbitrary and capricious
and against the substantial weight of evidence. *See, e.g., Fisher v. United
States*, 402 F.3d 1167, 1180 (Fed. Cir. 2005); *Jordan v. United States*, 205 Ct.
Cl. 65, 72-73 (1974). Plaintiff does not squarely address the proper legal
standard that applies to conditions that are other than "new" and instead urges

the court to find that the PEBs' decisions were against the great weight of evidence.

In response to the first question, defendant asserts that under SECNAVINST 1850.4D, paragraph 1001(f), the 2000 PEB was only required to address "those conditions for which the member was placed on the TDRL" and "all medical impairments diagnosed since the member was placed on the TDRL."[8]  Defendant also explains that in 2000, there were no regulations that specifically addressed how the final PEB should handle conditions that were

---

[8] The full text of SECNAVINST 1850.4D, paragraph 1001(f) is as follows:

In addition to addressing those conditions for which the member was placed on TDRL, TDRL physical examinations and PEB reevaluation shall address all medical impairments diagnosed since member was placed on TDRL, to include whether the new diagnosis was caused by the condition for which the member was placed on the TDRL, or the treatment received for such a condition.

(1) TDRL members determined Fit shall be entitled to a Formal PEB because removal from the TDRL represents a change in military status.

(2) Members on the TDRL shall be rated under the Veteran Administration Schedule of Rating Disability (VASRD) criteria in effect at the time of the member's final reevaluation.

neither new nor originally unfitting.[9]  Thus, there was no direction regarding reevaluation of Category 3 or 4 conditions in 2000.  We agree.

In 2000, regulation did not require the Navy to reevaluate plaintiff's Category 3 conditions while she was on the TDRL or at the time of her permanent retirement.  The Navy was only obligated to review and rate those conditions that were originally classified as Category 1 or met the definition of a "new condition" pursuant to SECNAVINST 1850.4D, paragraph 3618. This is because "the Navy takes a snapshot of the service member's condition at the time of separation from the service" noting which conditions warrant the separation by rendering the service member unfit.  *Stine v. United States*, 92 Fed. Cl. 776, 795 (2010).  In order to receive a rating for any disability other than a Category 1 condition, plaintiff would have to show that the condition was "new."

2.  When a Condition Must be Found Unfitting

In response to the second question, the plaintiff believes that a condition either had to be unfitting in 1995, or unfitting in 2000 and "exacerbated by a condition rated as unfitting in 1995."  Pl.'s Supplemental Br. 5.  According to plaintiff, the latter would qualify as a new diagnosis under SECNAVINST 1850.4D, paragraph 3618.  Yet, defendant asserts that a condition must have been unfitting while the member was still on active duty or must become unfitting during the TDRL and be caused by or related to the treatment of a condition for which the member was placed on TDRL.

---

[9] This gap in the regulation, according to defendant, was corrected in the 2002 version of the SECNAVINST, which reads

> During the review of individual TDRL cases, the Informal and Formal PEBs will not consider those diagnoses previously categorized as Condition III.  A final determination regarding a member's fitness for duty or recommended placement on the PDRL will be made based upon review of evidence pertaining to previously designated Category I or II conditions, or for conditions meeting the criteria of "new" diagnosis.

SECNAVINST 1850.4E, ¶ 3618(b) (April 30, 2002).

Both parties refer to SECNAVINST 1850.4D, paragraph 3618 to determine when a condition must be found unfitting. That regulation provides for two scenarios: 1) the condition was unfitting "at the time the member was placed on the TDRL" or 2) the condition became unfitting while the member was on the TDRL and "[t]he condition was caused by the condition for which the member was placed on the TDRL, or directly related to its treatment." SECNAVINST 1850.4D, ¶ 3618.

### 3. The 2011 BCNR Did Not Err by Applying Paragraph 3618

Finally, defendant explains that the 2011 BCNR's discussion of paragraph 3618 was not in error because that provision was the only means whereby a condition, other than those for which the member was placed on the TDRL, could be found unfitting and then rated. Plaintiff agrees that paragraph 3618 was the correct regulation to apply but argues that the 2000 PEB erred in its application of paragraph 3618 to the evidence.

The court concludes that in the absence of any other provision that could offer plaintiff the opportunity to be rated for a condition that was not a Category 1 condition, the 2011 BCNR did not err as a matter of law by evaluating plaintiff's disabilities for whether they satisfied the definition of a "new condition." The question of whether the 2011 BCNR's conclusions as to each condition were arbitrary, capricious, or unsupported by substantial evidence will be discussed in detail below.

### D.    Asserted Conditions

### 1. Calcaneal Spur (Right Heel)

Plaintiff first began having problems with her right heel in 1978, and she had her first heel surgery in 1979. The 1979 surgery did not resolve the matter, however, and she had further surgeries in 1993, 1994, and 1995. By 1995 her pain had only worsened. AR II at 185-86, 206-07. The 1995 PEB accordingly awarded her a thirty percent disability rating for her calcaneal spur. *Id.* at 207. In reaching its decision, the 1995 PEB noted plaintiff's ongoing foot pain, pain in other parts of her body caused by walking on her right foot that orthotics had not helped, and plaintiff's uneven (antalgic) gait.

Once plaintiff was placed on the TDRL, she was required to submit to periodic reevaluations for the purpose of determining whether new conditions existed and if her conditions had stabilized or become permanent. *See*

20

SECNAVINST 1850.4D, ¶ 1001(f).  Her first TDRL examination found her right foot "modestly tender to palpation" with a slightly restricted range of motion and a slight antalgic gait.  AR II at 271.  The doctor "did not feel that she is capable of performing the vigorous physical jobs required of a commander in the United States Navy."  *Id.* at 271-72.  Her second TDRL examination found some improvement; she was in "good health" except for the pain owing to her foot conditions.  *Id.* at 186.  The doctor noted that she had a full range of motion and "minimal tenderness to palpation."  *Id.*  Her actual diagnosis had become "calcaneal pain."  *Id.*

The 2000 PEB considered the second TDRL examination's findings and noted that plaintiff wore beach sandals with two-inch heels rather than orthopedic footwear.  *Id.* at 17.  That PEB reduced her disability rating for her right heel injuries to zero percent from thirty percent.  The 2004 BCNR Advisory Opinion noted that a ten percent rating would be proper for a "moderate" impairment while a zero percent rating would be appropriate for a "mild" impairment.  AR I at 98.  SECNAVINST 1850.4D, paragraph 3804(l)(1) provides that a medical condition, although it "causes or contributes to Unfitness for military service" may still be of such a "mild degree" that it does not meet the criteria for even a ten percent rating in the VASRD.  Under paragraph 3804(l)(1), a zero percent rating may be applied in such cases even though the conditions remain Category 1 "Unfitting Conditions."  The Advisory Opinion to the 2004 BCNR concluded that, because the 2000 PEB had good evidence for thinking plaintiff's impairment was mild rather than moderate, she had properly been given a zero percent rating for this condition.  AR I at 97-98.  The 2004 BCNR adopted the reasoning of the Advisory Opinion.  *Id.* at 85.  The 2011 BCNR agreed with the conclusions of the 2004 BCNR.  AR III at 6.

Because the 1995 PEB recognized plaintiff's right heel injuries, and the 2000 PEB determined that they remained unfitting, she has the burden to show that the military lacked substantial evidence in reaching its zero percent rating determination.  Defendant argues that the record contains sufficient evidence for the 2000 PEB to have lowered her disability rating and for the subsequent BCNRs to have upheld that determination.  Defendant points to the second TDRL examination which found some improvement and that she was in good health other than her foot pain.  Plaintiff was found to have a full range of motion and minimal tenderness to palpation.  Plaintiff offers nothing to rebut this evidence. We see no basis for finding that the 2000 PEB and subsequent BCNRs lacked substantial evidence to assign plaintiff a zero percent rating.

2.  Ganglion Cyst (Left Ankle)

Plaintiff first had left ankle problems in May 1995, after which medical professionals discovered a ganglion cyst on her left ankle.  AR III at 202.  The 1995 PEB assigned a ten percent rating to the condition in anticipation of surgery.  *Id.*  Her first TDRL examination mentioned no adverse symptoms related to her ganglion cyst and even removed it from the list of diagnosed conditions.  *Id.* at 886-92.  Plaintiff's second TDRL examination did not disagree with the first TDRL examiner's decision to remove the ganglion cyst from her list of diagnosed conditions.  AR II at 185-86.  A VA examination of plaintiff in March 2000 also found that her left ankle posed virtually no further problems.  AR III at 667, 675-77.

The 2000 PEB concluded that in "no way, shape, or form" did the medical evidence indicate her ganglion cyst continued to render her disabled. AR II at 18.  The PEB categorized the ganglion cyst as a condition contributing to her calcaneal spur.  *Id.* at 12.  The 2004 BCNR "substantially concurred" with the reasoning of the Advisory Opinion prepared for it.  AR I at 85.  The Advisory Opinion recommended upholding the 2000 PEB's determination of no disability because the medical evidence indicated the ganglion cyst did "not appear to have been the subject of much specific medical attention."  *Id.* at 98.  The 2011 BCNR adopted the reasoning of the 2004 BCNR.  AR III at 6.

Because the 1995 PEB recognized the diagnosis of a ganglion cyst on plaintiff's left ankle, and the 2000 PEB reconsidered the condition and categorized it as contributing to her calcaneal spur, she must show that her left ankle injury both disabled her in 2000 and required a disability rating greater than zero.  Plaintiff provides no compelling evidence on this point and defendant points to the examinations in which plaintiff was no longer diagnosed with a ganglion cyst.  We conclude that the BCNR's determination was supported by substantial evidence.

3.  Migraines

Plaintiff reported suffering from headaches as early as 1979 or 1980. AR III at 1407-10.  She reported her headaches as migraines and began receiving treatment as early as 1984, even undergoing hospitalization for a particularly severe migraine that year.  *Id.* at 1363-64, 1378, 1382, 1390, 1392. She continued to receive treatment in the early 1990s while working on special assignment at the Navy's Base Realignment and Closure ("BRAC") project.

*Id.* at 1024, 1045-46, 1071, 1086, 1095-97, 1121-22.   The 1995 PEB acknowledged plaintiff's migraine diagnosis but placed it in Category III, which includes conditions not separately unfitting and not contributing to an unfitting condition. AR II at 203.  The 1995 PEB reached its conclusion based on the facts that she had suffered from migraines for a long period of time, that her migraines had been controlled well with medication, and that her superior at BRAC had offered no indication that her migraines impaired her work ability.  *Id.*  Plaintiff went on to receive treatment for migraines during the following years.

On January 12, 1998, a VA examination in Tucson, AZ, found that a new set of medications had improved plaintiff's migraine symptoms. AR III at 912-13.  The first TDRL examination covered migraines in a neurology addendum of January 27, 1998; plaintiff apparently could not obtain the medication Fiorinal in the VA medical system, and her doctors at the VA had begun looking for other medications. *Id.* at 893-96.  The TDRL exam did not note any worsening in plaintiff's migraines. *Id.*  Her second periodic TDRL exam did not address her migraines. AR III at 752-57.  The 2000 PEB refused to consider plaintiff's migraines because she did not assert, and the evidence did not support a conclusion that her migraines rendered her unfit before her transfer to the TDRL in 1995. AR II at 16.  Therefore, the PEB concluded that plaintiff had not satisfied SECNAVINST 1850.4D, paragraph 3618 with respect to her migraines. *Id.*  The 2004 BCNR adopted the reasoning of an Advisory Opinion, AR I at 85, which explained that plaintiff's migraines did not render her unfit for service prior to her placement on the TDRL because she had been diagnosed with migraines long before. *Id.* at 98.  The 2011 BCNR adopted the reasoning of the 2004 BCNR, highlighting that plaintiff had not satisfied paragraph 3618 with respect to her migraines. AR I at 6-7.

Plaintiff argues that the evidence supports rating her migraines at 30 percent under applicable VASRD rules.  *See* 38 C.F.R. § 4.124a (2000) (stating that migraine conditions with "prostrating" attacks occurring on average once a month over several prior months receive a 30 percent rating).  Defendant responds that plaintiff failed to show that her migraines were unfitting prior to her placement on the TDRL, thus not meeting paragraph 3618.

While there is evidence in the record concerning plaintiff's migraines prior to 1995, this evidence does not support a conclusion that "the diagnosis actually significantly interfere[d] with the member's ability to carry out the duties of his or her office, grade, rank or rating."  SECNAVINST 1850.4D, ¶

1001(h); *see* AR III at 1045 ("Cronin had been doing well with respect to migraines, having had only a few in the past few months . . . . She has been admitted to psychiatric however for problems with depression, and mania, and is now diagnosed with bipolar disorder, manic type."); AR III at 1086 ("She has intermittent severe headaches with nausea preceded by flashing lights. . . . I also recommend using imitrex . . . since this would offer the opportunity for relief without stopping work."); *see also* AR II at 203.  Because this evidence does not show that the service member was unfit due to her migraines at the time she was placed on the TDRL, the condition is not rateable by the Navy even if the disability may be rateable pursuant to the VASRD.  *See* SECNAVINST 1850.4D, ¶ 3618.  The 2000 PEB's determination that "there is no evidence that the member had a separately unfitting condition from 'migraines' at the time she was placed on the TDRL, and, therefore, could not be rated by the formal board" is in accord with substantial evidence.  AR II at 16.  Likewise, the subsequent BCNR's conclusions regarding plaintiff's migraines are supported by substantial evidence in the record.  AR I at 98; AR III at 7.

### 4.  Carpal Tunnel Syndrome

Plaintiff first began exhibiting symptoms of CTS in March 1994.  AR II at 203.  The 1995 PEB classified plaintiff's CTS as not separately unfitting and not contributing to her unfitting conditions.  *Id*. at 205.  In reaching this conclusion, the PEB noted that nerve testing showed largely normal results.  *Id*. at 203; AR III at 1101-05.  After treatment with splints, subsequent nerve testing conducted in 1995 also revealed normal results.  AR III at 1057-58.  Plaintiff's first TDRL examination, reflected in an orthopedic hand clinic addendum revised on February 18, 1998, concluded that further nerve testing should be performed because her left side may have deteriorated.  *Id.* at 877-81.  Plaintiff eventually had surgery on both her right and left hands in an effort to resolve her CTS problems.  AR II at 252-53; AR III at 781.  A September 1999 neurology report from the Honolulu VA Medical and Regional Office Center noted that she had normal test results but that "she might certainly have CTS symptoms despite [the] normal studies."  AR III at 781.  Plaintiff reported ongoing pain problems in December 1999.  *Id.* at 766, 768.  Her second periodic TDRL examination did not address CTS, *id.* at 752-57, but an examination of her in July 2000 revealed that the CTS had "much improved" despite some residual "numbness."  AR II at 64.

The 2000 PEB determined that plaintiff's CTS was not rateable pursuant to SECNAVINST 1850.4D, paragraph 3618 because plaintiff did not

present evidence that it was separately unfitting at the time she was placed on the TDRL. AR II at 16. The 2004 BCNR incorporated the reasoning of an Advisory Opinion from the Naval Council of Personnel Boards, AR I at 85-86, which mentions the examination finding that the CTS had "much improved" and that no evidence supported that her condition was separately unfitting at the time she entered the TDRL. *Id.* at 93, 98. The 2011 BCNR concurred with the 2004 BCNR. AR III at 6. Plaintiff has not demonstrated that this finding was unsupported by substantial evidence. We therefore reject plaintiff's claim with respect to CTS.

### 5. Temporomandibular Joint Disorder

The earliest reference to TMJ in the record appears in plaintiff's application for VA benefits received July 1, 1996. In that document, she claimed that she suffered from TMJ with a diagnosis date of December 22, 1995. AR III at 995-98. The few medical notes from that time period in the record make no mention of TMJ. *Id.* at 1007-11. A December 1997 VA statement of plaintiff's case allowed for service connection of her TMJ but rated it at zero percent. AR III at 952. The statement noted that plaintiff had not exhibited any "limited motion or complaints of difficulty with mastication" when examined upon her discharge. *Id.* The VA statement also included references to a 1978 diagnosis of TMJ and a resurgence in 1996. *Id.* A subsequent order by VA requested that she be examined for TMJ. AR III at 931-32. The resulting January 20, 1998 Tucson VA examination found that plaintiff was diagnosed with TMJ on January 5, 1996. The examination report stated that she exhibited pain when opening her mouth widely. *Id.* at 900-901.

A November 1998 medical note lists TMJ as part of plaintiff's medical history. AR III at 843. In December of that year she had a TMJ evaluation and a bite plane performed. *Id.* at 708-13. She received ongoing treatment from a dentist during the period from November 1998 through late 1999, according to a February 2000 list of treatments. *Id.* at 714. In a letter dated July 13, 2000, a physician stated that plaintiff suffered from TMJ; the letter has "Psychiatry" on the date line. AR II at 165. A letter dated July 18, 2000, from a clinical psychologist stated that plaintiff's pain management included consideration of her TMJ, *id.* at 93, and Ann M. Fisher, a licensed social worker, mentioned TMJ in her July 20, 2000 letter. *Id.* at 137, 139.

The 2000 PEB did not consider TMJ nor did plaintiff present it for consideration. AR II at 15-19. In response to a request from the VA, a dentist examined plaintiff on September 28, 2000. AR III at 668. The dentist stated

that her treatment for TMJ had begun in the early 1990s and lead to acrylic splints in 1994. *Id.* She chewed with pain and had discomfort opening her mouth at 30mm. *Id.* Medical notes from 1994 do not reveal any discussion of acrylic splints. *E.g.,* AR III at 1069-75, 1079-86, 1089-91, 1094-98, 1107-11, 1113. The VA in 2001 decided to increase her TMJ rating from zero percent to twenty percent largely based on the dentist's letter. *Id.* at 654.

In her 2003 application to the BCNR, plaintiff requested a rating for TMJ. AR III at 209-10. She stated that it was diagnosed in 1994, that it caused her pain, that she required ongoing treatment, and that it affected her in 1995 before her placement on the TDRL. *Id.* The 2004 BCNR incorporated the reasoning of the Advisory Opinion, AR I at 85, which found insufficient evidence that TMJ rendered plaintiff unfit at the time of her placement on the TDRL. *Id.* at 98. The 2011 BCNR endorsed the 2004 BCNR and concluded that plaintiff had not shown TMJ was unfitting at the time she was placed on the TDRL in 1995. AR III at 6-7.

The court notes the conflicting dates of plaintiff's initial TMJ diagnosis and treatment. From the 1996 application to the VA, we have December 22, 1995. AR III at 995-98. The VA's 1997 statement of the case gives us 1978 and 1996. *Id.* at 952. The Tucson VA's 1998 statement gives us a diagnosis date of January 5, 1996. *Id.* at 900-01. The dentist's letter from September 28, 2000, suggests somewhere between the early 1990s and 1994. *Id.* at 668. Many of these statements reference medical records which do not appear in the Administrative Record. The earliest actual record of medical treatment from a dentist comes from plaintiff's treatment by Steve Wilhite, D.D.S. AR III at 714. The earliest actual record of diagnosis comes from the Tucson VA examination in January 1998. *Id.* at 900-901. The record of a 1996 service discharge examination in the 1997 VA statement does not seem to imply that she suffered from any symptoms that would render her unfit. *Id.* at 952.

Defendant argues that the Navy correctly denied plaintiff benefits with respect to TMJ because she has not proven that TMJ was separately unfitting prior to her placement on the TDRL in 1996. Plaintiff offers no substantial argument regarding TMJ. Because TMJ did not receive consideration prior to plaintiff's placement on the TDRL, as a new diagnosis it had to satisfy the requirements of SECNAVINST 1850.4D, paragraph 3618. In light of conflicting second-hand records and the earliest direct records displaying no disabling symptoms until 1998, if then, we agree that the 2004 and 2011 BCNRs had substantial evidence upon which to ground their determinations that TMJ was not unfitting at the time of plaintiff's placement on the TDRL.

Further, as we mentioned in our discussion of the applicable rules, a mere diagnosis does not entitle a service member to compensation in the Navy disability retirement system.  A condition must also be unfitting.  Plaintiff has identified no evidence in the record to satisfy paragraph 3618's requirement that TMJ was separately unfitting when she was placed on the TDRL or that TMJ was newly diagnosed, rendered her unfit, and was caused by a Category 1 condition all during the TDRL.  We agree with defendant that plaintiff has demonstrated no error with respect to the BCNR's determinations about TMJ.

6.  Sjögren's Syndrome

Although VA ratings do not bind the Navy, the VA's refusal to compensate a service member for a condition on the grounds that the condition lacks a confirmed diagnosis is telling.  The VA has consistently refused to award her any compensation for Sjögren's syndrome.  AR III at 638, 654-55, 953-54.  The VA relied in part on a 1998 Tucson VA examination of plaintiff's eyes stating that the evidence supported "no ocular pathology" and specifically that it did not support a diagnosis of Sjögren's syndrome.  *Id.* at 678.

Plaintiff's arguments make no mention of Sjögren's syndrome even in the section proposing ratings for all of her conditions.  She did not bring Sjögren's syndrome before the 2000 PEB.  AR II at 15.  She mentioned Sjögren's syndrome only once in her application to the 2004 BCNR.  AR III at 183.  The reference  occurred in an enclosure detailing all of the purported errors of the 2000 PEB.  She also stated that Sjögren's syndrome contributes to the unfitting quality of other conditions.  *Id.*  The application contained no specification or corroboration of how Sjögren's syndrome contributes to other conditions.  Responding to her application, the 2004 BCNR did not address Sjögren's syndrome.  AR I at 85-86.  The Advisory Opinion also did not address the condition.  *Id.* at 93-98.  The 2011 BCNR stated that plaintiff had not proffered any evidence that Sjögren's syndrome was a "new diagnosis" under SECNAVINST 1850.4D, paragraph 3618, because Sjögren's syndrome had neither rendered her unfit prior to her placement on the TDRL, nor was it caused or connected to a condition that did render plaintiff unfit.  AR III at 7.  Given the lack of record evidence, we see no reason to second-guess the 2011 BCNR's determination.

7.  Fibromyalgia

Plaintiff's claim for fibromyalgia fares little better than her claim for Sjögren's syndrome.  Plaintiff has produced a list of fibromyalgia "flares" occurring in 1996, 1997, 1999, 2002, 2004, 2005, and 2006.  AR III at 71-76. We find no evidence in the record to corroborate these assertions, however. For example, no medical reports or progress notes from 1996 or 1997 mention fibromyalgia.  *Id.* at 931-32; AR II at 59, 130-31.  Neither the Tucson VA examinations nor plaintiff's first periodic TDRL examinations mention fibromyalgia, even though plaintiff claims to have had a fibromyalgia flare in each of the prior two years.  *Id.* at 877-96, 900-920.

Plaintiff claims to have developed fibromyalgia in 1981 and to have suffered from several episodes between 1985 and 1996.  Plaintiff did not present fibromyalgia to the PEB in 1995, the VA in 1996, or the PEB in 2000. AR II at 201; AR III at 995-1005; AR II at 15-19.  Importantly, plaintiff does not identify any record evidence substantiating her claims about fibromyalgia even though she asks for a ten percent rating for the condition.

As with Sjögren's syndrome, plaintiff mentioned fibromyalgia once in her application to the 2004 BCNR; she stated merely that it was not an independently unfitting condition but that it contributed to her other conditions.  AR III at 183.  The 2004 BCNR as well as the Advisory Opinion did not address fibromyalgia.  AR I at 85-86, 93-98.  The 2011 BCNR concluded that plaintiff had not shown her fibromyalgia to be unfitting at the time she was placed at the TDRL or a causal connection between fybromyalgia and her Category 1 conditions.  AR III at 7.  Given the paucity of record evidence, we cannot reverse the BCNR determination.

8.  Chronic Pain

Medical notes from September 1999 state that plaintiff had chronic pain from "numerous etiologies" such as her calcaneal problems, migraines, and TMJ.  AR III at 777-79.  The notes imply plaintiff was first referred for chronic pain management around that time.  *See id.*  The court has no reason to find that plaintiff suffered from a separate condition of chronic pain before 1999; her arguments do not broach the subject, nor does plaintiff cite the administrative record regarding chronic pain.  A letter dated July 18, 2000, states that plaintiff began receiving chronic pain management services from Steven Miyake, a clinical psychologist, in October 1999.  AR II at 93.  The medical notes from September 1999 mention a referral to Mr. Miyake.  AR III

at 777. In the July 2000 letter, Mr. Miyake states that plaintiff received "therapy to help her cope with her chronic pain conditions including TMJ, migraine headaches, shoulder, hand, wrist, foot and ankle, and hip pain." AR II at 93.

As a new diagnosis, chronic pain would have to satisfy the requirements of SECNAVINST 1850.4D, paragraph 3618 in order to be compensated by the Navy. As we explained above, one requirement is that the new condition must be unfitting. Assuming, *arguendo*, that her chronic pain could satisfy the causation requirement in paragraph 3618, the court sees little evidence to ground the claim that chronic pain was a separately unfitting condition in 2000, let alone that there was enough evidence to conclude that the BCNR's determination was arbitrary and capricious or not supported by substantial evidence. Plaintiff's physicians clearly linked chronic pain to her other conditions, which implies that any disability owing to the chronic pain would be assessed as part of her other conditions. We find no fault with the decision of the BCNR.

9. Bipolar Disorder

Plaintiff underwent hospitalization for bipolar disorder from June 16, 1995, to July 13, 1995. AR II at 219. She was initially hospitalized on a voluntary basis, although after several days her request to depart was denied because medical professionals determined she needed further evaluation. *Id.* at 219-21. Some symptoms of her bipolar disorder mentioned in her inpatient psychiatric report and a report several weeks after her release include racing thoughts, pressured speech, irritability, a labile affect, and depressive symptoms. *Id.* at 211, 220. Some of her symptoms were brought under control with medication. *Id.* at 211. The 1995 PEB considered the evidence and determined that her bipolar disorder constituted an unfitting condition rateable at thirty percent. *Id.* at 202. A January 1998 psychiatric examiner for the VA doubted whether plaintiff had bipolar disorder at all; instead, the examiner proposed that she had anxiety disorder. AR III at 918-20. During plaintiff's first TDRL examination in late January 1998, the examiner thought she seemed to be exhibiting few symptoms of bipolar disorder except that her ongoing sadness could be a depressive episode. *Id.* at 882-85. By November 1998, plaintiff began undergoing psychiatric care at the Honolulu VA Medical and Regional Office Center. Her initial intake examiner found that plaintiff exhibited rapid speech, loose associations on occasion, and mood swings. *Id.* at 829-30.

In February 1999, plaintiff's PTSD counselor, Ann M. Fisher, proposed to plaintiff's mental health doctor at the Honolulu VA Medical and Regional Office Center that plaintiff had PTSD only and not bipolar disorder; the doctor, however, opted to continue treating plaintiff for bipolar disorder and PTSD until he had better information.  AR III at 817.  By April, plaintiff's mental health doctor began seeking the transfer of her mental health records in order to clarify the bipolar diagnosis.  *Id.* at 810.  Later that month, plaintiff's doctor began a course of medication to stabilize her mood.  *Id.* at 807-08.  In September, her new mental health doctor found that she had "some lability in her affect with pressured speech which appeared to be hypomanic symptoms."  AR III at 780.  The doctor continued medicating plaintiff.  *Id.* Also in September 1999, another doctor at the VA Medical and Regional Office Center apparently agreed with Ann M. Fisher's PTSD-only hypothesis; he even attributed plaintiff's labile affect to PTSD.  *Id.* at 777-79.  Another VA mental health doctor was apparently not persuaded, continuing to treat plaintiff for both PTSD and bipolar disorder in November 1999. *Id.* at 776.  Her mental health doctor continued treatment for both bipolar and PTSD after sessions in December 1999 and January 2000, noting particular bipolar symptoms like her labile affect and pressured speech.  AR III at 759-62.  Plaintiff's second TDRL psychiatric addendum mentions her mood swings and depressive symptoms, eventually recommending that she be placed on the PDRL.  *Id.* at 752-55.

Another of plaintiff's mental health doctors, Anita Graham-Roy, M.D., composed a letter dated July 19, 2000, noting that plaintiff still suffered from bipolar disorder:

> At the time of my initial appointment with Ms. Cronin on July 12, 2000, she remained with symptoms of her bipolar illness. She was noted to be excitable, hypomanic with racing thoughts and pressured speech.  She complained of poor concentration and required frequent redirection throughout the assessment. Her medications continue to be adjusted to assist with the management of her bipolar illness.  She remains with significant impairment in social and occupation functioning.

AR II at 133.  Ann M. Fisher, a licensed social worker and plaintiff's PTSD therapist, in a letter dated July 20, 2000, made no mention of bipolar disorder except for noting plaintiff's 1995 diagnosis and hospitalization. *Id.* at 134-39.

The 2000 PEB acknowledged the less than clear character of plaintiff's bipolar disorder but chose to rate it at thirty percent because she did continue

to receive medications and display some symptoms. AR II at 18-19. The 2004 BCNR incorporated the reasoning of its Advisory Opinion, AR I at 85, which highlighted the record evidence that she still suffered from bipolar disorder symptoms but did not suffer at the level required for a fifty percent rating. *Id.* at 96-97. The 2011 BCNR concurred with the 2004 BCNR. AR III at 6.

Although plaintiff apparently requested that the 2004 BCNR give her a fifty percent rating for bipolar disorder, AR I at 96, she does not appear to challenge the thirty percent rating here. Her requested total disability rating incorporates only a thirty percent rating for the condition. Pl.'s Resp. & Reply 30. We find no basis for reversing the Board's conclusions as to bipolar disorder.

10. Post-traumatic Stress Disorder

A January 1998 psychiatric examiner for the VA in Tucson, AZ, offered the opinion that plaintiff had only a general anxiety disorder. AR III at 918-20. The medical notes from that examination indicate no prior diagnosis of PTSD. *Id.* By January 28, 1998, however, plaintiff's first TDRL examination for the Navy mentioned that she had been diagnosed with PTSD and had begun seeing sexual trauma counselors in the VA at Tucson. AR III at 882-85. A psychiatric intake from November 1998 mentions her PTSD diagnosis, although the licensed social worker who filled out the forms expressed skepticism about the diagnosis. *Id.* at 835. Around this time, plaintiff began meeting with Ann M. Fisher, another licensed social worker, one or two times per week for PTSD therapy sessions. *Id.* at 836. Her subsequent sessions from November 1998 through June 1999 with a Honolulu VA psychiatric resident, Ernest P. Alaimalo, M.D., reveal a joint treatment for bipolar disorder and PTSD. *Id.* at 803-05, 807-10, 817-19, 828. As mentioned in the above discussion of plaintiff's bipolar disorder, Dr. Alamailo entertained Ann M. Fisher's PTSD-only hypothesis but chose to treat both until he got better information. *Id.* at 817. In July 1999, plaintiff visited another psychiatric resident, Anita M. Graham-Roy, M.D. Dr. Graham-Roy did not acknowledge plaintiff's PTSD diagnosis, instead focusing on her bipolar disorder diagnosis. *Id.* at 790.

Plaintiff's next mental health doctor at the Honolulu VA Medical and Regional Office Center, Maria R.G. Mabini, M.D., noted in September 1999 her history of sexual trauma and continued treatment for PTSD. AR III at 779-80. Around the same time, notes from the VA mental health clinic state that plaintiff's symptoms were better explained by PTSD than bipolar disorder. *Id.*

at 777-79.  Plaintiff was transferred in November 1999 to Peter P. Rudlowski, M.D., who acknowledged the PTSD diagnosis while seeking to focus on symptoms of bipolar disorder.  *Id.* at 758-59, 761-62, 776.  Plaintiff's second TDRL examination recorded her assertions of sexual trauma and treatment for PTSD, although it too focused on her bipolar disorder symptoms.  *Id.* at 752-55.  Dr. Rudlowski continued acknowledging and treating both PTSD and bipolar disorder from at least April 2000 through June 2000.  AR II at 141-44.  As mentioned in our discussion of bipolar disorder, Dr. Graham-Roy wrote a letter dated July 19, 2000, acknowledging ongoing treatment for plaintiff's bipolar disorder and PTSD.  Dr. Graham-Roy noted that plaintiff continued having weekly sessions with Ann M. Fisher and focused on her ongoing symptoms of bipolar disorder.  *Id.* at 133.  Ann M. Fisher, the licensed social worker, wrote a letter dated July 20, 2000.  There she laid out a narrative of plaintiff's PTSD and  assertions of sexual trauma.  *Id.* at 134-39.

The 2000 PEB refused to award plaintiff any disability for PTSD because it had been diagnosed subsequent to her placement on the TDRL and because it did not satisfy the requirements of SECNAVINST 1850.4D, paragraph 3618.  AR II at 16.  The 2004 BCNR refused to alter the 2000 PEB's decision and concurred with the reasoning of the Advisory Opinion.  AR I at 85.  The Advisory Opinion mentioned two key problems with plaintiff's request for PTSD compensation: she lacked sufficient evidence of "egregious evoking stressors" as well as any evidence that PTSD rendered her unfit when she was placed on the TDRL.  *Id.* at 97.  After this court granted judgment on the Administrative Record regarding PTSD, the Federal Circuit vacated the judgment, *see Cronin*, 363 F. App'x at 33-34, highlighting the July 2000 letter composed by the social worker, Ann M. Fisher, which cataloged plaintiff's history of sexual trauma and seemed to constitute documentation of "egregious evoking stressors."  *Id*. at 34; AR II at 134-39.

On remand, the 2011 BCNR concurred with the 2004 BCNR decision.  AR III at 6.  It went on to elaborate why Ann M. Fisher's letter did not constitute sufficient documentation of plaintiff's "egregious evoking stressors."  The BCNR found that plaintiff's allegations lacked credibility, pointing out that references to sexual traumas largely came from what she told psychiatric professionals in the late 1990s.  *Id.* at 6-9.  Independently, the 2011 BCNR also concurred with the 2004 BCNR's conclusion that plaintiff did not prove PTSD rendered her unfit prior to her placement on the TDRL.  *Id.* at 6-7.

Plaintiff has submitted with her response and reply an application to the BCNR dated March 19, 1985, in order to buttress her argument concerning

PTSD-inducing sexual trauma throughout her Navy career. Plaintiff argues that, because the 2011 BCNR found insufficient evidence of her "egregious evoking stressors," e.g., sexual traumas, evidence of such traumas would be relevant to this court's decision. This material was not presented to the more recent BCNR's, and she admits that "[t]his relevant and probative material should have unquestionably been included in the Administrative Record presented to the BCNR." Pl.'s Opp'n Mot. Strike 2.

Defendant has moved to strike the 1985 BCNR materials on the ground that they were not presented to the 2004 or 2011 BCNR, despite the fact that plaintiff had the opportunity to present then. As defendant has pointed out, the Federal Circuit has made it clear that, "where evidence could have been submitted to a corrections board and was not, the evidence is properly excluded by the Court of Federal Claims." *Barnick v. United States*, 591 F.3d 1372, 1382 (Fed. Cir. 2010). Plaintiff has not offered a reason for avoiding that rule. We therefore grant defendant's motion to strike.

Even assuming we reject the BCNR's finding that there was no credible evidence of "evoking stressors" that could have triggered PTSD, the condition has to be treated as a new diagnosis. Plaintiff admits that "'there is no evidence in the administrative record, other than [her] own statements, that she experienced symptoms of PTSD before her transfer to the TDRL.'" Pl.'s Resp. & Reply 24 (quoting Def.'s Resp. & Cross-Mot. 23). In other words, she contends that it would be sufficient, for the purposes of SECNAVINST 1850.4D, paragraph 3618, if there were both evidence of prior "egregious evoking stressors" and a subsequent diagnosis of PTSD in her periodic TDRL examinations. Pl.'s Resp. & Reply 24. We disagree. As we have iterated above, the Navy compensates a new disability when it meets one of two requirements. Plaintiff could show that a condition for which she was placed on the TDRL or its treatment later lead to her PTSD. Alternatively, she could show that her PTSD was caused by her service and that rendered her unfit prior to her placement on the TDRL. Evidence tending to show that a new diagnosis was caused by events *prior to* being placed on the TDRL does not satisfy the need for proof that the diagnosed condition rendered plaintiff unfit at the time she was placed on the TDRL. SECNAVINST 1850.4D, ¶ 3618.

Plaintiff provides two alternative arguments as to how she satisfies the rules on compensability of new diagnoses. First, plaintiff argues that her hospitalization for bipolar disorder in 1995 was such a traumatic event that it qualifies as an egregious evoking stressor independent of prior sexual trauma. This would link the PTSD to the treatment for bipolar disorder. The 2011

BCNR considered this argument and pointed out that she was initially hospitalized voluntarily. AR III at 3. The language of plaintiff's medical board report after hospitalization substantiates the BCNR's conclusion; it also records the determinations of licensed medical professionals about her behavior during the period and the need for further evaluation when she sought to leave during her hospitalization. AR II at 219-21. None of the notes of the medical board, which were contemporaneous with plaintiff's discharge, reflect the occurrence of a trauma. Although Ms. Fisher, a licensed social worker, considered her hospitalization a stressor, *id.* at 136-38, the BCNR was entitled to reject that view based on its own assessment of the medical notes and the observations of psychiatrists and medical doctors. As we mentioned above, Ms. Fisher was the only professional who credited plaintiff's treatment for bipolar disorder as a stressor for PTSD.

Second, counsel for plaintiff advanced in oral arguments the notion that her bipolar diagnosis in 1995 instead should have been PTSD. Ms. Fisher, the licensed social worker, clearly thought so and attempted to convince medical doctors of her opinion, as we mentioned above. However, the first doctor she approached with this opinion required better information before ceasing plaintiff's treatment for bipolar disorder. AR III at 817. As we mentioned above in our discussion of plaintiff's bipolar disorder, almost all of her subsequent mental health doctors maintained the bipolar-disorder diagnosis and mentioned its ongoing symptoms. One person other than Ms. Fisher, Dr. Enrico G. Camara, seems to have favored the PTSD diagnosis over bipolar disorder. *Id.* at 779. Although it does not appear that plaintiff directly raised this theory before the 2011 BCNR, *id.* at 16-67, Ms. Fisher presents the theory in her records, which were before the BCNR. Given the current record, the BCNR would be within the bounds of reason to favor the opinions of doctors and psychologists who maintained the bipolar diagnosis over one licensed social worker and one doctor who advanced a PTSD-only theory. The evidence does not require reversing the BCNR.

The 2011 BCNR did not act arbitrarily or capriciously in its determination concerning plaintiff's PTSD. As the BCNR pointed out, the record lacks "substantiating evidence" to corroborate plaintiff's claims of rape, assault, stalking, and harassment, which were the alleged "egregious evoking stressors" that caused her PTSD. AR III at 6. Even if there was sufficient documentation of "egregious evoking stressors," the BCNR endorsed and reiterated the reasoning of the 2004 BCNR with respect to the need to show that PTSD rendered her unfit in 1995. *Id.* at 6-7. The state of the evidence is such that reversing the BCNR as to plaintiff's PTSD would do violence to the

totality of the record.  This court must rule in favor of defendant on plaintiff's claim for PTSD.

We have considered plaintiff's claims for a calcaneal spur, a ganglion cyst, migraines, carpal tunnel syndrome, temporomandibular joint disorder, Sjögren's syndrome, fibromyalgia, chronic pain, bipolar disorder, and post-traumatic stress disorder.  For each of her claims, she had a burden to show not only that her symptoms matched VASRD guidelines but that a condition rendered her unfit for service.  With respect to the diagnoses that were not originally deemed unfitting, plaintiff had to show that a condition satisfied SECNAVINST 1850.4D, paragraph 3618.  Plaintiff has not met that burden for any condition.

## CONCLUSION

We grant defendant's cross-motion for judgment on the administrative record with respect to the question of whether plaintiff's promotion to Commander should have occurred earlier and with respect to plaintiff's assertion that her disability retirement rating should be higher as to all asserted conditions.  Therefore, we deny plaintiff's motion for judgment on the administrative record in all respects.  We also grant defendant's motion to strike.  The clerk is directed to enter judgment accordingly.  No costs.

<u>s/ Eric G. Bruggink</u>
Eric G. Bruggink
Judge